SIX WEST RETAIL ACQUISITION, INC., Plaintiff,

v.

SONY THEATRE MANAGEMENT COR-PORATION, Loews Theatre Manage-ment Corporation, Talent Booking Agency, Inc., Loews Fine Arts Cinemas, Inc., Sony Pictures Entertainment Inc., Sony Corporation of America, Sony Cor-poration, James Loeks, Barrie Lawson Loeks, Travis Reid, Seymour H. Smith, and Thomas Brueggemann, Defendants.

No. 97 Civ. 5499(LAP)(JCF).

United States District Court, S.D. New York.

Sept. 6, 2001.

David Boies, Alan B. Vickery, Boies, Schiller & Flexner LLP, Armonk, NY, David A. Barrett, Jack G. Stern, Barrett, Gravante, Carpinello & Stern LLP, New York City, for plaintiff.

Fredric W. Yerman, Phillip A. Geraci, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for Sony Corporation, Sony Corporation of America and Sony Pictures Entertainment Inc.

Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, for defendants.

### MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff, Six West Retail Acquisition, Inc. ("Six West"), brought this action against various corporate and individual defendants alleging (1) breach of contracts related to the defendants' management of three movie theaters owned by Six West; (2) breach of fiduciary duties arising from these contracts; (3) tortious interference with the plaintiff's prospective business relations; (4) unjust enrichment; (5) restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (6) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (7) anticompetitive merger in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Six West has now moved to compel the depositions of certain high-ranking officers of two corporate defendants. For the reasons that follow, the plaintiff's motion is granted.

*Background*[1]

1. A more detailed factual background can be found in the Honorable David N. Edelstein's opinion denying the defendants' motion to dismiss. *See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.,* No. 97 Civ. 5499, 2000 WL 264295, at *1–11 (S.D.N.Y. March 9, 2000).

## A. *Parties* [2]

Six West, formerly known as Solow Theatre Corporation, is a New York corporation with its principal place of business in New York, New York. (First Amended Complaint dated Dec. 4, 1997 ("Amended Compl."), ¶¶ 6, 34). The plaintiff leases out and otherwise controls three movie theaters located in Manhattan: (1) the New York Twin (the "Twin"), a thousand-seat, two-screen theater, located at 265 East 66th Street; (2) the Paris Theatre (the "Paris"), a single screen theatre with a seating capacity of 575, located at 4 West 58th Street; and (3) the premises of the former Festival Theatre (the "Festival"), located at 6 West 57th Street. (Amended Compl. ¶ 4, 6). Sheldon H. Solow, a real estate developer, is Six West's owner, its sole shareholder, and a corporate officer. (Amended Compl. ¶ 4, 6).

Defendant Loews Theatre Management Corporation ("Loews Theatres"), also known at various times as Sony Theatre Management Corporation ("Sony Theatres"), is a Delaware corporation with its principal place of business in New York. (Amended Compl. ¶ 7). Defendant Loews Fine Arts Cinemas, Inc. ("Loews Fine Arts") is a subsidiary of Sony Theatres through which the latter conducted business with the Paris and the Festival Theatres. (Amended Compl. ¶ 10). Defendant Talent Booking Agency, Inc. ("TBA") is a New York corporation. (Amended Compl. ¶ 9). Originally a Loews subsidiary, TBA is now affiliated with Sony Theatres. (Amended Compl. ¶ 9, 34).

Defendant Sony Pictures Entertainment Corporation ("Sony Pictures" or "SPE"), a Delaware corporation and the parent company of Sony Theatres, produces and distributes motion pictures and exhibits them through Sony Theatres, along with other companies. (Amended Compl. ¶ 11). Defendant Sony Electronics Corporation ("Sony USA"), a New York corporation formerly known as Sony Corporation of America ("SCA"), is the parent company of Sony Pictures. (Amended Compl. ¶ 12). Defendant Sony Corporation, a Japanese corporation, is the ultimate parent company of Sony USA and the other Sony defendants.[3] (Amended Compl. ¶ 13).

Individual defendants include James Loeks and Barrie Lawson Loeks, formerly Co-Chairpersons of Sony Theatres; Travis Reid, President of Sony Theatres and TBA; Seymour H. Smith, Executive Vice President of Sony Theatres and TBA; and Thomas Brueggemann, Sony Theatres's Vice President. (Amended Compl. ¶¶ 14–18).

## B. *Allegations*

In 1978, after Mr. Solow had allegedly developed a close relationship with a senior executive of Loews Theatres, Solow Theatre Corporation, the plaintiff's predecessor-in-interest, entered into an agreement with TBA regarding the management and the operation of the Twin (the "Twin Agreement," attached as Exh. A to Affidavit of Rachel S. Fleishman dated Jan. 8, 1998 ("Fleishman Aff.")). (Amended Compl. ¶ 33). The plaintiff contends that the Sony defendants did not fulfill their obligation under the Twin Agreement to play only first-run films of equal or better quality than the movies shown at the defendants' other venues on the East Side of Manhattan. Six West further claims that the defendants violated the terms of the agreement by booking poorly performing films at the Twin, exhibiting movies for unnecessarily prolonged periods, and failing to maintain the theatre's physical condition. (Amended Compl. ¶¶ 68–74).

Sometime in 1990, Mr. Solow, on behalf of Six West, began to operate the Paris Theatre, allegedly one of the country's most prestigious venues used to premier "top quality films." (Amended Compl. ¶¶ 43, 51). Shortly thereafter, Sony started managing

---

**2.** The various relationships among the corporate defendants are outlined thoroughly in the Amended Complaint. The defendants have generally denied almost all of the allegations, including those pertaining to their corporate structure. However, they have not set forth any alternative facts. Accordingly, the Amended Complaint will serve as the basis for information on corporate organization of the defendants.

**3.** Hereinafter, the term "Sony," unless specifically modified, will include Sony Theatres, Sony Pictures, and Sony USA, as well as Loews Theatres, Loews Fine Arts, and TBA.

the Paris for Mr. Solow pursuant to a financial arrangement purportedly similar to the one governing the Twin.[4] The plaintiff asserts that the defendants violated this arrangement by: (1) premiering various movies at the Paris, thereby affording these films the benefit of the theatre's prestige, and then refusing to continue to exhibit them at the Paris or at the plaintiff's other venues; (2) showing films at the Paris for protracted periods; and (3) ignoring previous guarantees to continue the Paris' history of exclusive bookings while diverting successful films to Sony's Lincoln Square theatre. (Amended Compl. ¶¶ 51–67).

According to the plaintiff, at the time Sony assumed management of the Paris, it also agreed to operate the Festival.[5] (Amended Compl. ¶ 47). Six West argues that the defendants "grossly mismanaged the Festival Theatre and allowed its profitability and physical appearance to deteriorate [so] dramatically" that the plaintiff decided to close it down in 1994. (Amended Compl. ¶ 75).

In support of its Sherman Act claim, Six West alleges that the defendants engaged in a series of block-booking agreements with distributors, limiting the availability of motion pictures to independent theatre owners and reducing competition. (Amended Compl. ¶ 78). Block-booking is an unlawful practice through which film distributors condition the license or sale of their more desirable movies on the acceptance of unwanted or inferior films. See United States v. Paramount Pictures, Inc., 334 U.S. 131, 156–59, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (describing block-booking and holding it to be per se violation of antitrust laws). According to the plaintiff, the defendants admitted to "a pattern of blatantly anticompetitive conduct" in their correspondence with Mr. Solow, after he expressed his dissatisfaction with the films Sony exhibited at the plaintiff's theatres. (Amended Compl. ¶¶ 78–82).

On September 30, 1997, shortly before the plaintiff filed its amended complaint, Loews Theatres entered into a merger agreement with Cineplex Odeon ("Cineplex"), a major national chain of movie theaters, making Cineplex a wholly owned subsidiary of Loews and creating the Loews Cineplex Entertainment Corporation ("LCE"). See Proposed Final Judgment and Competitive Impact Statement, 63 Fed.Reg. 25071, 25077 (May 6, 1998). The merger was consummated only after Loews and Cineplex agreed to divest themselves of a number of movie theatres in New York and Chicago. See id. at 25076. Plaintiff claims that the merger between Sony, "the largest movie chain in Manhattan," and Cineplex, "Manhattan's second largest theatre operator," demonstrates Sony's monopolistic intent and violates the antitrust laws. (Amended Compl. ¶¶ 3, 127–31).

C. *Procedural History*

Plaintiff filed the original complaint in this action on July 24, 1997. On December 4, 1997, after the merger between Loews and Cineplex became public knowledge, Six West filed an amended complaint, adding a Clayton Act claim directed against the merger. On March 8, 2000, the Honorable David N. Edelstein issued an opinion denying the defendants' motion to dismiss for failure to state a claim. See Six West Retail Acquisition, Inc., 2000 WL 264295, at *36.

Sometime between December 29, 2000, and late January of 2001, the plaintiff informed the defendants of its intention to depose three high-ranking Sony executives: Nobuyuki Idei, Chairman and Chief Executive Officer ("CEO") of Sony Corporation; Howard Stringer, Chairman and CEO of SCA; and Tadasu ("Ted") Kawai, a former Deputy President of SCA and currently a senior official at Sony Corporation. (Declaration of Christopher M. Green dated May 22, 2001 ("Green Decl."), Exh. 3; Defendants' Memo-

---

4. According to the plaintiff, the parties exchanged drafts of a written management agreement, but no final version was ever signed. Nevertheless, the plaintiff asserts that Six West and Sony effectively acted pursuant to two letter agreements—a proposal contained in Mr. Solow's letter of October 1, 1993, and another proposal offered by Loews Fine Arts in its letter

dated May 18, 1994. (Amended Compl. ¶ 44; Fleishman Aff., Exhs. C, D).

5. The Amended Complaint provides no details about a management agreement regarding this theatre.

randum of Law in Opposition to Motion to Compel ("Def. Memo.") at 11; Declaration of Nobuyuki Idei dated June 12, 2001, ¶ 1; Declaration of Howard Stringer dated June 14, 2001, ¶ 1; Declaration of Tadasu Kawai, dated June 12, 2001, ¶ 1). A dispute over the propriety of these depositions quickly developed, and Six West made the instant motion after attempts to arrive at a mutually acceptable resolution had failed.

*Discussion*

### A. *Analytical Framework*

The Federal Rules set very liberal limits on the scope of discovery. A party may inquire about "any matter, not privileged, that is relevant to [a] claim or defense[,]" and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R.Civ.P. 26(b)(1). Moreover, "[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive] has a busy schedule'" cannot shield that witness from being deposed. *Consolidated Rail Corp. v. Primary Industries Corp.*, No. 92 Civ. 4927, 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) (quoting *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)). Even where, as in this case, a high-ranking corporate officer denies personal knowledge of the issues at hand, this "claim ... is subject to testing by the examining party." *Consolidated Rail Corp.*, 1993 WL 364471, at *1 (citation omitted).

Nevertheless, discovery is not boundless, and a court may place limits on discovery demands that are "unreasonably cumulative or duplicative," or in cases where

> the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2). Thus, likelihood of harassment and business disruption are factors to be considered in deciding whether to allow discovery of corporate executives. *See Consolidated Rail Corp.*, 1993 WL 364471, at

*1; *see also Arkwright Mutual Insurance Co. v. National Union Fire Insurance Co.*, No. 90 Civ. 7811, 1993 WL 34678, at *2 (S.D.N.Y. Feb. 4, 1993) (denying application for protective order precluding deposition of company's president). Unless it can be demonstrated that a corporate official has "some unique knowledge" of the issues in the case, "it may be appropriate to preclude a redundant deposition of [this] highly-placed executive" while allowing other witnesses with the same knowledge to be questioned. *Consolidated Rail Corp.*, 1993 WL 364471, at *1 (citations omitted). The plaintiff's motion to compel discovery must be viewed in light of this legal framework.

### B. *Deposition of Nobuyuki Idei*

Six West seeks to depose Mr. Idei, the CEO of Sony Corporation. The plaintiff has presented sufficient evidence to infer that Mr. Idei has some unique knowledge on several issues related to its claims. For example, he appears to have been well informed about a dispute over the relatively new "firm-term" pricing arrangement between Sony Pictures, the film distribution arm of Sony, and Loews Theatres, Sony's movie theatre chain. (Green Decl., Exhs. 30, 31).

The rental fees a film exhibitor would pay to a distributor had traditionally been calculated after the film's release and were based on its actual performance. Under the more recently developed practice of firm-term pricing, the terms of a film's rental are set before its release without an opportunity to adjust the rental rates in light of the movie's profitability. This arrangement effectively shifts the risk of a film's underperformance to the exhibitor. (Green Decl., Exh. 31 at SC00951).

Not surprisingly, Loews Theatres opposed what from its perspective was a less advantageous way to pay the distributor for the right to show SPE's films. (Green Decl., Exh. 31 at SC00951). Notwithstanding Loews' objections, SPE ultimately employed firm-term pricing with all of its customers beginning in 1997. (Green Decl., Exh. 13 at 47–49). This pricing scheme, while not illegal in and of itself, is some evidence of a coercive relation-

ship between SPE and film exhibitors, bolstering the plaintiff's block-booking claim.

Mr. Idei was also present at the January 21, 1997, Sony Corporation Board of Directors' meeting, when the directors assessed whether "[t]he current theatre business exists for priority distribution of SPE movies." (Green Decl., Exh. 33 at SC05078). The minutes of this meeting, supplied by the plaintiff, are understandably succinct and offer no additional details on the contemplated nature of the relationship between SPE and the exhibitors—whether, for instance, "priority distribution" of SPE's films was to be achieved by way of a block-booking arrangement between Sony's distributor and the theaters. Nevertheless, the plaintiff should be permitted to question Mr. Idei about his own understanding of that relationship and the role he played in the board's discussion.

There is also evidence that Mr. Idei was substantially involved in the management of Loews Theatres and in the planning of the merger between Loews and Cineplex Odeon. After Loews Theatres had been acquired by Sony, he took part in discussions surrounding the question of what name would be used for the new theatre chain. In a February 27, 1996 letter, Mr. Idei expressed strong opposition to putting the "Sony" name on all of movie the theaters operated by Loews on the ground that Sony's corporate image would be tarnished. (Green Decl., Exh. 25). SPE's senior management, which had pushed for a wholesale re-naming since at least September of 1994 (Green Decl., Exh. 26), acceded to the CEO's demands. However, efforts were made to minimize public references to Mr. Idei's central role in shaping Sony's image in this country. (Green Decl., Exhs. 26, 27). An internal memorandum dated January 21, 1997 also indicates that Mr. Idei participated in deliberations related to the corporate governance of Sony Retail Enter-

tainment ("SRE"), the parent company of Loews Theatres. (Green Decl., Exhs. 28, 29 at 3).

As to the Loews–Cineplex merger, Mr. Idei fielded several reports from senior members of Sony's management team, discussing the costs and benefits of the proposed merger, giving updates on the progress of the deal, as well as informing him about the composition of the Board of Directors for LCE, the new business entity. (Green Decl., Exhs. 12, 32, 34, 37). Moreover, Lawrence J. Ruisi, SRE's president,[6] testified that Mr. Idei participated in the regular meetings of SCA's executive committee before the merger. (Green Decl., Exh. 17 at 123). An internal memorandum directed to Mr. Idei, requesting that the issues related to the Loews–Cineplex merger be discussed at an upcoming meeting of Sony's board, gives an overview of the merger that comes alarmingly close to supporting the plaintiff's claims of monopolistic conduct: "[t]he movie theatre business industry has been heading toward oligopoly due to the increase in required capital, from the trend of megaplex." (Green Decl., Exh. 36 at 1).

Finally, on September 11, 1996, Mr. Solow wrote a letter to Mr. Idei detailing, in the letter itself and a number of attachments that followed, his escalating dispute with Sony over what the plaintiff claims to be the defendants' block-booking practices in New York. In one of the attachments, according to the plaintiff, Mr. Reid, President of Sony Theatres, admitted to this illegal scheme.[7] A week later, Mr. Idei responded briefly, assuring Mr. Solow that Sony had this matter under consideration and telling him that Tadasu Kawai, SCA's Deputy President, had been asked to investigate Mr. Solow's allegations. During this investigation, the plaintiff asserts, Mr. Kawai obtained additional information related to Loews Theatres' manage-

---

6. Subsequent to the merger, Mr. Ruisi became President and CEO of Loews Cineplex Entertainment. (Green Decl., Exh. 17 at 7).

7. The plaintiff contends that the following statement, excerpted from Mr. Reid's August 15, 1996 letter to Mr. Solow, amounts to such an admission: "[A]s I have previously explained to you, the East [S]ide has become the most competitive zone in Manhattan, with 25 screens operated by

four different exhibitors. *It is therefore necessary to form relationships in order to be booked properly on a long term basis. Our relationships on the East [S]ide are with Paramount, Warner Brothers, and Gramercy.*" (Green Decl., Exh. 39 at 1; Memorandum in Support of Plaintiff's Motion to Compel the Depositions ("Pl. Memo.") at 14–15 (emphasis in Pl. Memo.)).

ment of the plaintiff's venues and forwarded it to Mr. Idei's office together with his draft response to Mr. Solow.[8] (Green Decl., Exhs. 40, 41). The materials included in Mr. Kawai's correspondence to Mr. Idei contained yet another purported admission of block-booking made by Mr. Reid.[9]

The defendants argue that Mr. Idei, admittedly an extremely busy corporate executive, had no personal knowledge of what they try to portray as a very narrow dispute between the United States affiliates of Sony Corporation and Mr. Solow's company about the proper management of the plaintiff's three theatres located in Manhattan. (Def. Memo. at 16–17). "To put it starkly," they claim, "Mr. Idei ... knows [nothing] about whether or not there were a few broken seats in the Paris, or whether or not *Trainspotting* should or should not have played at the New York Twin." (Def. Memo. at 17).

Yet, the plaintiff's allegations sweep more broadly than assertions about broken chairs. With respect to one of its Sherman Act claims, for instance, Six West argues that Sony's block-booking arrangements have "effectively exclud[ed] small, independent theatre owners such as the plaintiff from competition to obtain first run, high-quality motion pictures" by putting a premium on the exhibitor's size as a measure of its ability to "liquidate" all of the distributor's films. (Amended Compl. ¶¶ 113–14, 116). Mr. Idei may not have had any inkling of the specific day-to-day management decisions which resulted in the plaintiff's injuries. Nevertheless, Six West has offered sufficient evidence to support an inference that Sony's CEO had been well-informed about the general structure of Sony's film distribution policies, and

that he also had *some* unique knowledge about the company's alleged block-booking practices in the United States, particularly in New York.

Similarly, the plaintiff's Clayton Act claim alleges broadly that Sony's "dramatically enhance[d]" market power, in the wake of the purportedly illegal Loews–Cineplex merger, will "impede [the] plaintiff's ability to obtain quality motion pictures for exhibition." (Amended Compl. ¶¶ 129, 130). According to Six West, this injury will only be exacerbated by the alleged block-booking arrangements between the new entity and its corporate affiliates engaged in film distribution. (Amended Compl. at ¶ 130). There is ample evidence of Mr. Idei's hands-on involvement in various aspects of Loews–Cineplex merger, including some indication that he was aware that the merger was taking place in the context of an increasingly concentrated film exhibition industry.

The record belies the defendants' complaint that the plaintiff has not sought to question lower level corporate officials with similar knowledge before asking this Court to compel the depositions of Mr. Idei and the two other Sony executives. Six West has already questioned several current and former lower level officials designated by various Sony defendants pursuant to Rule 30(b)(6) of the Federal Rule of Civil Procedure.[10] For instance, the plaintiff has taken depositions of James Amos, a Rule 30(b)(6) representative of SPE and currently the Eastern Division Manager for Sony Pictures Releasing (Green Decl., Exh. 13 at 21); Lawrence Ruisi and Mindy L. Tucker, both former Vice Presidents at SPE (Green Decl.,

---

**8.** In one of the reports apparently generated in response to Mr. Kawai's inquiry, Barrie Lawson Loakes writes to Mr. Ruisi that he is "very sorry that ... Mr. Idei had to be bothered by Sheldon [Solow]." (Green Decl., Exh. 40 at FF 006098).

**9.** The plaintiffs quote this passage from another of Mr. Reid's letters to Mr. Solow: "The [E]ast [S]ide of New York is a highly competitive and important zone consisting of 25 screens operated by four different exhibitors. *In order for distributors to be certain of proper placement in this zone they make long term relationships with one or two of these exhibitors who agree to participate in the liquidation of all of their product, not just high*

*profile films like 'Emma'.... [W]ith our three screens on the [E]ast [S]ide of New York, we primarily play films from Paramount, Warner Brothers, and Gramercy Pictures."* (Green Decl., Exh. 40 at FF 006102; Pl. Memo. at 15 (emphasis in Pl. Memo.)).

**10.** Rule 30(b)(6) provides, in relevant part, that "the organization ... named [as a deponent] shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify."

Exh. 17 at 6–7 and Exh. 18 at 4–5); Michael Barker, Co–President of a division of SPE (Green Decl., Exh. 14 at 13); William A. Glaser, a Rule 30(b)(6) representative and a former Vice President of SCA (Green Decl., Exh. 15 at 20); and Nobuyuki Oneda, a Rule 30(b)(6) representative of Sony Corporation as well as a former General Manager of Corporate Planning and Control at Sony Corporation (Green Decl., Exh. 16 at 15; Pl. Memo. at 6). Given the extent of discovery already undertaken, the depositions of Mr. Idei and the others may be cumulative to some degree, but not unreasonably so. *See Travelers Rental Co. v. Ford Motor Co.,* 116 F.R.D. 140, 145 (D.Mass.1987).

The decisions cited by the defendants in support of their argument against compelling depositions in this case are readily distinguishable. For instance, in *Thomas v. International Business Machines,* 48 F.3d 478 (10th Cir.1995), the plaintiff, a clerical employee in a regional office of IBM, sued her employer, alleging that her supervisors' repeated attempts to induce her early retirement violated various provisions of the Age Discrimination in Employment Act. *Id.* at 481–82. She sought to depose IBM's chairman, but the district court granted the defendant's motion for protective order. In upholding that order, the Tenth Circuit credited the high-ranking executive's assertion that he had no personal knowledge related to the events surrounding the alleged discrimination against the plaintiff. *Id.* at 483. The court, however, noted that the officer's testimony "could be relevant" had the plaintiff made allegations touching on the corporation's general employment policies, such as a disparate impact claim. *Id.* The court concluded:

> When we add [the failure to allege a disparate impact claim and the executive's lack of knowledge together with the plaintiff's] failure to give [the executive] adequate notice, the burden that a hurried deposition would have imposed on [that executive], the fact that [the plaintiff] waited until the eleventh hour to request the deposition, and her failure to depose any other IBM personnel, including her own direct supervisors, it [is] clear ... that the

district court did not abuse its discretion in issuing the protective order.

*Id.* at 484.

In this case, on the other hand, Six West's antitrust claims do raise questions related to Sony's corporate policies. The plaintiff has shown that Mr. Idei has unique knowledge with respect to some of those questions. *See Travelers Rental Co.,* 116 F.R.D. at 146 (information concerning corporate motive or intent resides with executives with greatest level of authority). Furthermore, Six West has taken depositions of many lower level Sony officials before making the additional requests here; it has not come forth with these requests at the eleventh hour and has provided ample notice to the relevant Sony officials. Thus, there is no indication that the plaintiff is using these depositions merely for harassment.

A recent decision from this district cited by the defendants, *Filetech, S.A. v. France Telecom, S.A.,* No. 95 Civ. 1848, 1999 WL 92517 (S.D.N.Y. Feb. 17, 1999), is equally unhelpful. In that case, the Honorable Charles S. Haight did not permit the deposition of France Telecom's president in order to determine whether the defendant's business activities in the United States were sufficiently extensive to establish jurisdiction under the Sherman Act. Judge Haight perceived "a risk that plaintiff's counsel, turned loose upon [the president], may seek to pursue a number of [unrelated] issues," and proceeded to observe that it was "likely that lesser France Telecom employees are available to furnish information sufficient to satisfy the narrow jurisdictional inquiry being conducted [here]." *Id.* at *2.

This court, unlike the court in *Filetech,* is not faced with a "narrow" threshold inquiry, but with wide-ranging allegations that corporate policies ran afoul of antitrust law. Additionally, any threat of harassment in this case is minimal because the plaintiff has been able to articulate specific claims that will ultimately provide the basis for the depositions.

In another case relied on by the defendants, *In re Alcatel USA, Inc.,* 11 S.W.3d 173 (Tex.2000), the Supreme Court of Texas rejected the plaintiff corporation's efforts to

depose the current and previous chairmen of a rival company based on vague and conclusory assertions that these officials had been involved in a plan to steal new telecommunications technology developed by the plaintiff. With respect to the role of the current chairman, for example, the court noted that:

> Proof of the importance of the project to [the defendant], combined with the allegation that the issue in this case 'smacks of chairman-level importance,' at most tends to show that the chairman-level official whose deposition is sought may possess discoverable information. It does not, however, arguably show that the official's knowledge is unique or superior.

*Id.* at 177.

Six West, by contrast, supports its allegations with evidence sufficient for this Court to infer that Mr. Idei has some unique knowledge on a number of relevant issues. The defendants' argument to the contrary is unpersuasive. They claim that Six West has "culled" a variety of unrelated documents containing the names of the officials it seeks to depose in an effort to "manufacture a basis for taking their depositions." (Def. Memo. at 18). Again, the defendants are defining the plaintiff's claims too narrowly. While none of the documents deal with the specific management decisions regarding what movie will be shown at which particular theatre, they do relate to the broader issues of Sony's allegedly anticompetitive involvement in the New York film exhibition market.

11. The plaintiff cites as an example a letter from Yuki Nozoe, an SPE executive, in which he requests that SRE, Sony's movie exhibition affiliate, should be required to accept "firm-term" pricing. (Green Decl., Exh. 30 at SC05178–79). In a handwritten note on the letter, Mr. Nozoe apparently asks that Mr. Stringer not be the official making the ultimate decision on this issue. (Green Decl., Exh. 30 at SC05175, SC05179). A different note indicates that Mr. Stringer participated in a subsequent discussion about resolving this conflict. (Green Decl., Exh. 30 at SC05173, SC05177).

12. In November of 1997, Mr. Stringer fielded memoranda from Robert Wiesenthal of Credit Suisse First Boston and Nick Henny, SCA's Chief Financial Officer, advising him not to appoint

### C. *Deposition of Howard Stringer*

■ Six West has also supported its request for the deposition of Howard Stringer, President of Sony USA, with evidence showing his unique knowledge on at least one of the issues in this case. As has already been discussed, the plaintiff argues that Sony's "firm-term" pricing arrangement establishes the coercive nature of the relationship between SPE, Sony's film distribution arm, and various exhibitors. This relationship, according to Six West, forms the basis for the plaintiff's block-booking claim. It appears that Mr. Stringer, along with Mr. Idei, played some role in mediating a dispute between various Sony entities over whether Sony's own movie theatre chain should be forced to adopt "firm-term" pricing.[11] After the Loews–Cineplex merger, Mr. Stringer continued to be involved in discussions related to the question of how LCE, the new business entity, would be affected by the implementation of the novel pricing arrangement.[12] Accordingly, the plaintiff should be able to learn from Mr. Stringer about his part in shaping the relationship between SPE and film exhibitors.

### D. *Deposition of Tadasu Kawai*

■ Finally, the plaintiff seeks to question Mr. Kawai, who had served as Deputy Chairman of SCA during the events at issue in this case before assuming a senior executive position at Sony Corporation. There is little doubt that Mr. Kawai's deposition would be appropriate, and the defendants themselves do not argue otherwise.[13] He was the official ultimately responsible for investigating the

SPE executives to LCE's board of directors. Both Mr. Wiesenthal and Mr. Henny were concerned with the potential for a conflict of interest at the board meeting when "firm-term" pricing would be discussed. (Green Decl., Exhs. 47, 49). Nonetheless, Mr. Stringer recommended that two SPE executives and another executive with an SPE affiliate be appointed to the LCE board (Green Decl., Exh. 37 at SC01528), and Sony appears to have followed his advice. (Green Decl., Exh. 2).

13. In a letter dated March 2, 2001, Sony's counsel had already offered to make Mr. Kawai available for deposition "for one day," and "without prejudice to [the] position that none of the depositions are proper." (Green Decl., Exh. 5).

allegations of block-booking made by Mr. Solow in the September 11, 1996 letter to Mr. Idei and for forwarding the information collected during this inquiry to Sony's CEO. (Green Decl., Exhs. 8, 9, 11, 40, 41). There is additional evidence that Mr. Kawai, as senior executive at SCA, was involved in the management of Loews Theatres,[14] even taking part in the discussion regarding prioritizing the distribution of Sony's films during the February 1997 meeting of Sony Corporation's board.[15] (Green Decl., Exh. 33 at SC05078). Accordingly, the plaintiff should be able to question Mr. Kawai about the results of his investigation and any involvement in Sony's purportedly illegal film distribution practices.

### E. Location of Depositions

■ The remaining issue concerns the appropriate location for the depositions of Mr. Idei and Mr. Kawai. There is a general presumption that "a defendant's deposition will be held in the district of his residence." *Mill–Run Tours, Inc. v. Khashoggi,* 124 F.R.D. 547, 550 (S.D.N.Y.1989); *see also Federal Deposit Insurance Co. v. La Antillana, S.A.,* No. 88 Civ. 2670, 1990 WL 155727, at *1 (S.D.N.Y. Oct. 5, 1990). Thus, a plaintiff may only overcome this presumption by showing "peculiar" circumstances favoring depositions at a different location. *Id.* (citation omitted).

■ However, the presumption loses its force in cases where the plaintiff's choice of forum is effectively constrained. *See Devlin v. Transportation Communications International Union,* Nos. 95 Civ. 0752, 95 Civ. 10838, 2000 WL 28173, at *3 (S.D.N.Y. Jan. 14, 2000); *La Antillana,* 1990 WL 155727, at

*2; *Mill–Run Tours,* 124 F.R.D. at 550. And it can be overcome by a "showing that factors of cost, convenience, and litigation efficiency militate in favor of holding the deposition" outside of the witness' district. *Devlin,* 2000 WL 28173, at *3 (citations omitted); *see also Doe v. Karadzic,* Nos. 93 Civ. 878, 93 Civ. 1163, 1997 WL 45515, at *3–4 (S.D.N.Y. Feb. 4, 1997), *adopted,* 1997 WL 746512 (S.D.N.Y. Dec. 3, 1997).

### 1. Choice of Forum

■ Six West has not argued that it was constrained to litigate this case only in New York. Therefore, the presumption that deponents be examined in their district of residence is fully applicable.

### 2. Cost

Both parties are well-equipped to bear the costs associated with this deposition. The scales may tip slightly against Sony as the heavyweight, but Mr. Solow, who is plainly the force behind this suit, is no stranger to the legal system [16] and has already shown the financial wherewithal to go the distance in this case. Moreover, the increase in the overall cost of litigation will be equally significant, no matter where the depositions take place. The defendants have asserted the need for their executives to bring Japanese counsel with them to New York to assist in depositions. Thus, the expense of transporting the parties' New York attorneys to Japan are likely to be roughly equivalent to the cost of having the two Sony executives and their legal coterie journey to New York.

---

14. In late 1996 and early 1997, Mr. Kawai received a number of reports related to the management of SRE, Loews' parent company. (Green Decl., Exhs. 28, 42, 43, 45, 46). On February, 14, 1997, he, in turn, wrote a memorandum to senior officials at Sony Corporation making proposals on (1) SRE's structure after the Loews–Cineplex merger, and (2) the future of Lincoln Square Theatre, Sony's premier movie theater in Manhattan. (Green Decl., Exh. 44).

15. Mr. Idei was also present at this meeting.

16. The defendants point to a ruling by the Honorable Edward J. Greenfield, a Justice of the

New York Supreme Court, in which he observed that Mr. Solow is "one of the most litigious parties in our court." (Opinion filed December 31, 1998, attached as Exh. A to Declaration of Manvin S. Mayell dated June 14, 2001 ("Mayell Decl."), at 3–4; *see also* Opinion dated May 25, 2000, attached as Exh. B to Mayell Decl., at 8–10 (imposing sanctions on Mr. Solow for personal involvement in frivolous litigation conduct); *Solow v. Stone,* 163 F.3d 151 (2d Cir.1998) (per curiam); *Solow v. BMW (US) Holding Corp.,* No. 97 Civ. 1373, 1998 WL 717613 (S.D.N.Y. Oct. 14, 1998)).

### 3. *Convenience*

Mr. Idei and Mr. Kawai both work and reside in Japan. Both are high-ranking executives of a major corporation, whose busy schedules would obviously be disrupted by a trip to the United States. Their absence at work would also adversely affect the defendants' affairs.

The plaintiff points out that Mr. Idei regularly travels to New York on business and could be deposed during one such trip to lessen the disruption to his schedule and Sony's business. (Pl. Memo. at 23). But such an arrangement would mitigate the burden only slightly. Depositions in New York are also likely to interfere with Mr. Idei's and Mr. Kawai's schedules on those trips, which are set well ahead of the time of their departure.[17]

Plaintiff's counsel will be placed under some burden if required to travel to Japan for an opportunity to question these witnesses. Nevertheless, Six West's attorneys, seasoned litigators from a law firm with nationwide offices, have substantial resources and experience to accomplish this. *See La Antillana*, 1990 WL 155727, at *3 (comparing significant burden of travel on solo practitioner with mere inconvenience to attorneys at a large firm). "In any event, the convenience of counsel is less compelling than any hardship to the witnesses." *Devlin*, 2000 WL 28173, at *4; *see also Yaskawa Electric Corp. v. Kollmorgen Corp.*, No. 00 C 1757, 2001 WL 649532, at *2 (N.D. Ill. June 7, 2001); *Buzzeo v. Board of Education*, 178 F.R.D. 390, 393 (E.D.N.Y.1998). Altogether, then, the convenience factors favor taking depositions in Japan.

### 4. *Efficiency*

Considerations of efficient litigation cut slightly against taking depositions outside of New York. The records relevant to these proceedings are primarily located here. Additionally, judicial supervision of overseas depositions by telephone may be difficult. *See*

*Mill–Run Tours*, 124 F.R.D. at 551. However, there is little indication that such supervision is going to be necessary. While parties in this case have had their share of disagreements, these disputes have not been characterized by any "unusual degree of acrimony." *La Antillana*, 1990 WL 155727, at *3. Overall, these factors cannot defeat the presumption accorded to the deponents in this action. If anything, they counsel that questioning should proceed in Japan. Accordingly, the depositions of Mr. Idei and Mr. Kawai shall be taken there, and they shall be conducted in accordance with the Federal Rules of Civil Procedure. *See Madanes v. Madanes*, 199 F.R.D. 135, 140–42 (S.D.N.Y.2001) (deposition abroad may be held under Federal Rules).

### *Conclusion*

For the reasons set forth above, the plaintiff's motion to compel the depositions of Nobuyuki Idei, Howard Stringer, and Tadasu Kawai is granted. The depositions of Mr. Idei and Mr. Kawai shall take place in Japan, with each party bearing its own costs.

SO ORDERED.

---

**17.** The plaintiff places great deal of emphasis on its argument that requiring depositions to take place in Japan will delay discovery by as much as six months. (Pl. Memo. at 22–23; Green Decl., Exh. 54 at 4) (Department of State circular indicating that "[t]he American Embassy in Tokyo is generally booked six months in advance."). Yet, attempting to fit these depositions into a busy executive's business trips to New York is equally likely to cause a lengthy delay.