GENERAL STAR INDEMNITY
COMPANY, Plaintiff,

v.

PLATINUM INDEMNITY LIMITED and
Bank of America, N.A., Defendant.

Bank of America, N.A., and Platinum
Indemnity Limited, Counterclaim–
Plaintiffs,

v.

General Star Indemnity Company,
Counterclaim–Defendant,

No. 00 CIV 4960(LMM)(GWG).

United States District Court,
S.D. New York.

Sept. 26, 2002.

Thomas H. Golden, Willkie Farr & Gallagher, New York City, for Plaintiff General Star Indemnity Company.

Adam K. Hollander, Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendant Bank of America, N.A.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Plaintiff/counterclaim-defendant General Star Indemnity Company has moved for a protective order barring defendant/counterclaim-plaintiff Bank of America, N.A. from taking the depositions of two individuals: Tad Montross and Ronald Ferguson. Montross and Ferguson are respectively a current and a former executive of General Reinsurance Corporation ("General Re"), a nonparty entity that is General Star's parent company. For the reasons set forth below, the motion is denied.

### I. FACTS

#### A. The Underlying Transactions

This case arises from a complex series of insurance and other commercial transactions involving these and other parties, which has already been described in part in a related case, *Bank of America, N.A. v. Terra Nova*

*Ins. Co. Ltd.*, 211 F.Supp.2d 493, 494–95 (S.D.N.Y.2002). In brief, Platinum Indemnity Limited or its affiliates (collectively, "Platinum") entered into a series of weather derivative contracts with various third parties under which Platinum accepted certain weather related risks at locations throughout the United States. In connection with these contracts, Bank of America entered into letter of credit agreements with Platinum pursuant to which Bank of America extended letters of credit for Platinum's account. As required by these agreements, Platinum purported to procure reinsurance policies from General Star and other insurance companies in order to provide security for Bank of America's potential obligations. Under the reinsurance policies, General Star and the other insurance companies had to indemnify Bank of America and Platinum for any payments they were required to make in connection with the underlying weather derivative contracts.

Ultimately, payments were required to be made to the third parties under the weather derivative contracts and thus to Platinum and Bank of America under the reinsurance policies as well. The dispute in this case centers on the authority of the individual who allegedly acted as a "Managing General Agent" ("MGA") of General Star (and the other insurance companies) in issuing the reinsurance policies: Harold Mollin of the Customized Worldwide Weather Insurance Agency, Inc. General Star alleges that Mollin acted without authority in purporting to bind General Star to the reinsurance policies and that the policies are therefore invalid. Bank of America asserts that the insurance policies are binding. Mollin long ago fled the country.

### B. *The Brooks Deposition*

On February 6, 2002, Bank of America conducted the deposition of Kevin Brooks, the president of General Star. During the deposition, Brooks disclosed that General Re had sustained massive financial losses during an event referred to as "the Unicover situation." *See* Deposition of Kevin Brooks, dated February 6, 2002 ("Brooks Dep.") (reproduced as Ex. B to Affidavit of W. Bradley Hunt in Support of Bank of America's Memorandum of Law in Opposition to General Star's Motion for a Protective Order, dated September 4, 2002 ("Hunt Aff.")), at 403–16. Brooks also testified that, in response to the Unicover situation, General Re had issued guidelines for its affiliates, including General Star, for dealing with MGAs. *See* Brooks Dep. at 405–08, 413–16. Brooks believed the person who issued the MGA guidelines was Tad Montross and that he was the vice-chairman of General Re. *Id.* at 416.

### C. *The First Subpoena to Montross*

On April 23, 2002, Bank of America served a subpoena on Montross. Affidavit of Thomas H. Golden in Support of General Star's Motion for a Protective Order, dated August 22, 2002 ("Golden Aff."), at ¶ 3. Montross is currently the president, vice-chairman and chief underwriting officer of General Re and sits on the board of directors. *See* Affidavit of John Roberts ("Roberts Aff."), dated August 21, 2002, at ¶ 2. General Star objected to the subpoena on a number of grounds and the parties attempted to resolve the dispute themselves. Golden Aff. at ¶¶ 4, 5. General Star offered to produce John Roberts, an assistant vice president of General Re, as a replacement for Montross. *Id.* at ¶ 5. Bank of America agreed to the replacement but reserved its right to depose Montross if Roberts lacked relevant information. *See* Letter from William Bradley Hunt to Brett Wiggins ("Hunt Letter"), dated May 7, 2002 (reproduced in Golden Aff. Ex. B), at 3.

### D. *Discovery of the Ferguson and Montross Memos*

On May 29, 2002, the day before Roberts's deposition, General Star disclosed to Bank of America a 1999 memorandum authored by Ronald Ferguson regarding policies for dealing with MGAs. *See* Hunt Aff. at ¶ 5. Ferguson was the chairman, chief executive officer and a director of General Re in 1999; the chief executive officer through September 2001; and chairman of the board of directors through June 3, 2002. Roberts Aff. at ¶ 2. Ferguson currently advises General Re in a consulting capacity. *Id.* The Ferguson memorandum asked that the affiliates of General

Re "scour" their relationships with MGAs to ensure that they were not conducting business with "unscrupulous MG whatevers 'out there.'" Memorandum to Richard H. Hinchcliff, *et al.*, from Ronald E. Ferguson, dated February 4, 1999 (reproduced in Hunt Aff. Ex. C), at 1–2.

During the May 30, 2002 deposition of Roberts, Roberts disclosed that a separate 1999 memorandum had been authored by Montross directing General Re's affiliates to follow something referred to as the "Managing General Agents Act." *See* Deposition of John F. Roberts ("Roberts Dep."), dated May 30, 2002 (reproduced in Hunt Aff. Ex. E), at 82. This memorandum too had not previously been disclosed to Bank of America, *see* Hunt Aff. at ¶ 6, and was not available at the deposition. *See* Roberts Aff. at 140. General Star produced the Montross memorandum to Bank of America on June 5, 2002. Hunt Aff. at ¶ 6. The memorandum from Montross was sent to a number of people, including Brooks, and apparently attached a copy of a "model" Managing General Agents Act to serve as "process template" for dealings with MGAs. Memorandum to Andy Di Loreto, *et al.*, from Tad Montross, dated October 15, 1999 (reproduced in Hunt Aff. Ex. D), at 1.

### E. *Deposition of John Roberts*

During Roberts's deposition, Bank of America attempted to question him regarding the Unicover matter. Roberts was unable to answer many of the questions, however. In particular, Roberts testified that he knew nothing about General Re's involvement in the Unicover incident and did not know how General Re came to learn about it. Roberts Dep. at 51, 53, 72. He also testified that the only people within General Re who dealt with the Unicover situation were top executives, although he did not know what the "division of responsibility" was among the top executives with respect to Unicover. *Id.* at 72–73, 76–77. Roberts also stated he did not have knowledge of the motivations or concerns of Montross or Ferguson that led them to issue their respective memoranda about MGA's. *See id.* at 68, 135, 144, 146, 148.

### F. *The Subsequent Subpoenas and Current Dispute*

On June 14, 2002, Bank of America issued a second subpoena to Montross and for the first time subpoenaed Ferguson. Golden Aff. at ¶¶ 7–8. On August 22, 2002, General Star filed the instant motion for a protective order. In support of its motion, General Star filed a memorandum of law, an affidavit of its attorney, and an affidavit from Roberts. In his affidavit, Roberts claims to have been the author of the October 15, 1999 memorandum that was distributed under Montross' name. *See* Roberts Aff. at ¶ 4. General Re supplied no affidavits from Montross or Ferguson. Bank of America has opposed the motion.

## II. *DISCUSSION*

### A. *Standard of Review*

■ Under Fed.R.Civ.P. 26(b)(1), a party may obtain discovery regarding any non-privileged matter "relevant to the claim or defense of any party." In light of the broad scope of pre-trial discovery, the Second Circuit has held that "an order to vacate a notice of taking [a deposition] is generally regarded as both unusual and unfavorable." *Investment Properties Int'l, Ltd. v. IOS, Ltd.,* 459 F.2d 705, 708 (2d Cir.1972) (citation omitted); *accord Speadmark, Inc. v. Federated Dep't Stores, Inc.,* 176 F.R.D. 116, 118 (S.D.N.Y. 1997) (order barring a party from taking a deposition is "most extraordinary relief") (citations omitted); *Naftchi v. New York Univ. Med. Ctr.,* 172 F.R.D. 130, 132 (S.D.N.Y. 1997) ("it is exceedingly difficult to demonstrate an appropriate basis for an order barring the taking of a deposition") (citation omitted). The party seeking to bar the deposition bears the burden of demonstrating that the proposed deposition would not lead to relevant information. *See Speadmark,* 176 F.R.D. at 118.

Of course, "discovery is not boundless, and a court may place limits on discovery demands that are unreasonably cumulative or duplicative." *Six West Retail Acquisition v. Sony Theatre Management Corp.,* 203 F.R.D. 98, 102 (S.D.N.Y.2001) (internal quotation marks and citations omitted). Courts

have granted protective orders for high-level executives where a party seeking to take a deposition had not yet attempted to obtain information from lower level executives, *see Consolidated Rail Corp. v. Primary Indus. Corp.*, 1993 WL 364471, at *1 (S.D.N.Y. Sept.10, 1993); where high-level executives plainly had no knowledge of the facts, *see Armstrong Cork v. Niagara Mohawk Power Corp.*, 16 F.R.D. 389, 390 (S.D.N.Y.1954); or where the deposition was solely sought to harass the executive, *see Digital Equip. Corp. v. System Indus., Inc.*, 108 F.R.D. 742, 744 (D.Mass.1986) (disallowing deposition of a company president where a lawyer admitted he was going to "waste one of [the president's] afternoons" by taking the deposition).

 In deciding whether to permit the deposition of a corporate executive, a court must examine the possibility of harassment and the potential disruption of business. *See Six West*, 203 F.R.D. at 102; *Tri–Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 102 (S.D.N.Y.1997); *Primary Indus.*, 1993 WL 364471, at *1. A court will often deny a request to depose a high ranking corporate official when lower ranking executives have access to the same information. *See, e.g., Primary Indus.*, 1993 WL 364471, at *1 ("where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive.") (citations omitted). However, "[h]ighly-placed executives are not immune from discovery." *Id.; see also Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 1987 WL 11994, at *4 (D.D.C. May 26, 1987) ("high ranking corporate executives are not automatically given special treatment which excuses them from being deposed."). Finally, "the fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984) (citation omitted).

### B. *General Star's Arguments*

 General Star has not come forward with any competent evidence demonstrating either that Montross and Ferguson do not possess information relevant to Bank of America's claims or that they possess information that duplicates the information provided by Roberts. While a party moving for a protective order with respect to a deposition typically provides an affidavit from the person who seeks to avoid being deposed, *see Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 122 n. 4 (D.Conn.1974) (citing *Parkhurst v. Kling*, 266 F.Supp. 780 (E.D.Pa. 1967)), neither Montross nor Ferguson submitted affidavits at all, let alone affidavits swearing that they lack relevant knowledge or that their knowledge is identical to Roberts's. Instead, General Star relies on an affidavit from Roberts alone. But Roberts is able to state only that he is "the most knowledgeable person" on the matter because he reported information from affiliates to Montross and Ferguson regarding MGAs. *See* Roberts Aff. at ¶¶ 6, 7. It does not state that he is the "only" knowledgeable person or even that Montross and Ferguson's knowledge is necessarily a subset of his own.

Case law makes plain that a second-hand affidavit of the kind Roberts has given here is "insufficient" because it "fall[s] well short of an unequivocal statement that [the proposed deponent] lacks relevant knowledge." *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 34678, at *2 (S.D.N.Y. Feb.4, 1993). In addition, Roberts admitted numerous times during his deposition that he did not have knowledge concerning either the Unicover incident, *see* Roberts Dep. at 51, 53, 72, or the reasons behind the issuance of the MGA guidelines. *See id.* at 135, 144, 146, 148. Because General Star's "chosen spokesman has failed to satisfy [Bank of America's] needs," the higher level executives are not entitled to a protective order. *Amherst Leasing*, 65 F.R.D. at 123. The cases cited by General Star barring the deposition of high-level executives, *see* Memorandum of Law in Support of Plaintiff General Star Indemnity Company's Motion for a Protective Order ("Pl.Mem."), dated August 22, 2002, at 6, are not to the contrary because in each instance, the discovery at issue had not yet been attempted from alternative sources.

Moreover, Roberts's testimony actually points to Montross and Ferguson as the persons who issued the guidelines regarding

84

MGAs in response to the Unicover matter. *See* Roberts Dep. at 68, 73, 76, 80, 82, 83, 135, 146, 148. Courts have allowed depositions of high ranking corporate executives where questions have been raised regarding corporate policies. *See, e.g., Six West,* 203 F.R.D. at 105–06 (compelling the deposition of the CEO of the Sony Corporation and the President of Sony America); *see also Travelers Rental Co., Inc. v. Ford Motor Co.,* 116 F.R.D. 140, 146 (D.Mass.1987) ("those with greater authority may have the last word on why Ford formulated and/or administered the plan in the manner which the lower level executives described it"). As a matter of logic, a top executive who issues a corporate policy will likely have knowledge of the reasons for the issuance of the policy that a subordinate will not.

In its reply memorandum, General Star asserts that any information that could be obtained from Montross or Ferguson is not relevant to the litigation. *See* Reply Memorandum of Law in Further Support of Plaintiff General Star Indemnity Company's Motion for a Protective Order, dated September 12, 2002, at 2–4. As a threshold matter, the Court rejects this argument because it was made for the first time in a reply memorandum. *See, e.g., Romeu v. Cohen,* 121 F.Supp.2d 264, 273 (S.D.N.Y.2000), *aff'd,* 265 F.3d 118 (2d Cir.2001). In any event, the Unicover matter and the subsequent MGA guidelines are relevant to the claims in this case because Bank of America alleges that General Star failed to conduct oversight of Mollin and his company as required by the Montross and Ferguson memoranda.

Finally, General Star argues that Bank of America should not be allowed to depose Montross or Ferguson because Bank of America agreed to General Star's production of Roberts as a substitution. *See* Pl. Mem. at 3–4. This argument is meritless because Bank of America reserved its right to subpoena Montross if Roberts lacked relevant knowledge. *See* Hunt Letter at 3. There was no discussion at all regarding Ferguson. In any event, the agreement came before General Star produced either the Montross or Ferguson memoranda.

## III. *CONCLUSION*

For the above reasons, General Star's motion for a protective order is denied.