The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 9, 2020

## 2020COA67

**No. 19CA1671, *(Various) in re Appraisal v. Anschutz Corp* — Corporations — Mergers and Sales — Dissenters' Rights; Courts and Court Procedures — Uniform Interstate Deposition and Discovery Act — Issuance of Subpoena; Civil Procedure — Discovery Scope and Limits**

This opinion addresses, for the first time in a published opinion in Colorado, whether the intent and motives of a controlling stockholder are relevant in an appraisal proceeding, where Delaware Code Annotated title 8, section 262(h) (West 2019), requires a Delaware court to determine the reliability of and weight to give to the "deal price" in fixing the "fair value" of shares.

Additionally, this opinion considers, for the first time in a published opinion in Colorado, whether the Colorado Rules of Civil Procedure allow us the incorporate the so called "apex doctrine"

into Colorado law, thus shifting the traditional burden of persuasion under C.R.C.P. 26(c) to the party seeking a deposition.

COLORADO COURT OF APPEALS                                    **2020COA67**

Court of Appeals No. 19CA1671
City and County of Denver District Court No. 19CV287
Honorable Christopher J. Baumann, Judge

BlueMountain Credit Alternatives Master Fund L.P., BlueMountain Foinaven Master Fund L.P., BlueMountain Fursan Fund L.P., BlueMountain Guadalupe Peak Fund L.P., BlueMountain Kicking Horse Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenver Master Fund SCA SICA V-SIF, BlueMountain Summit Trading L.P., GKC Strategic Value Master Fund LP, and GKC SV SMA I, LLC: In re Appraisal of Regal Entertainment Group,

Petitioners-Appellants,

v.

Regal Entertainment Group, Anschutz Corporation, and Philip F. Anschutz,

Respondents-Appellees.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division A
Opinion by CHIEF JUDGE BERNARD
Martinez* and Davidson*, JJ., concur

Announced April 9, 2020

Ireland Stapleton Pryor & Pascoe, P.C., Mark E. Lacis, Lidiana Rios, Denver, Colorado, for Petitioners-Appellants

Hogan Lovells US, LLP, Jessica Black Livingston, Denver, Colorado, for Respondents-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1 The petitioners in this case are BlueMountain Credit Alternatives Master Fund L.P., BlueMountain Foinaven Master Fund L.P., BlueMountain Fursan Fund L.P., BlueMountain Guadalupe Peak Fund L.P., BlueMountain Kicking Horse Fund L.P., BlueMountain Logan Opportunities Master Fund L.P., BlueMountain Montenver Master Fund SCA SICA V-SIF, BlueMountain Summit Trading L.P., GKC Strategic Value Master Fund LP, and GKC SV SMA I, LLC. We shall call them the "minority stockholders."

¶ 2 The minority stockholders asked the trial court to compel Philip F. Anschutz, who is the founder and chief executive officer of the Anschutz Corporation, to comply with a deposition subpoena. (The Anschutz Corporation is also a party to this appeal.) The court denied their motion. The minority stockholders appealed. We reverse the trial court's order and remand the case to the district court for further proceedings consistent with this opinion.

## I. Background

¶ 3 Regal Entertainment Group, which, among other things, owns and manages movie theaters throughout the United States, is a Delaware corporation. The Anschutz Corporation was Regal's

1

controlling stockholder. The minority stockholders were noncontrolling, minority stockholders of Regal.

¶ 4 In February 2018, a British company called Cineworld Group plc acquired Regal in a transaction that we shall call "the merger." The minority stockholders, contending that they did not receive fair value for their shares in Regal, dissented from the merger and sought appraisal of their shares in a statutory proceeding in the Delaware Court of Chancery.

¶ 5 To obtain information for the appraisal proceeding, the minority stockholders served a deposition subpoena on Mr. Anschutz. In doing so, they relied on section 13-90.5-103, C.R.S. 2019, of the Uniform Interstate Depositions and Discovery Act, or the UIDDA.

¶ 6 Mr. Anschutz did not comply with the subpoena. So the minority stockholders filed a motion asking the trial court to order him to comply with it. They contended that, as the chief executive of the Anschutz Corporation, Mr. Anschutz was Regal's controlling stockholder and, as a result, discovering why Mr. Anschutz sold his share of Regal was critical and relevant to the appraisal proceedings. More specifically, they informed the court that they

wanted to ask Mr. Anschutz about his motives and personal considerations for agreeing to the merger.

¶ 7     The trial court denied the motion, concluding that the questions the minority stockholders wanted to ask Mr. Anschutz in a deposition were not "relevant and necessary" to the Delaware appraisal case.

## II.     Enforcement of the Deposition Subpoena

### A.     Standard of Review

¶ 8     We review a court's decision to deny a motion to compel compliance with a subpoena for an abuse of discretion. *Gateway Logistics, Inc. v. Smay*, 2013 CO 25, ¶ 13. A court abuses its discretion if its decision is manifestly unreasonable, arbitrary, or unfair, or if it misapplies the law. *Ferraro v. Frias Drywall, LLC*, 2019 COA 123, ¶ 10.

¶ 9     We will review de novo a trial court's (1) decisions regarding choice of law, *Mountain States Adjustment v. Cooke*, 2016 COA 80, ¶ 13; and (2) interpretation of pertinent statutes, *In re Marriage of Ciesluk*, 113 P.3d 135, 141 (Colo. 2005).

## B.    Choice of Law

¶ 10    The UIDDA allows a party to "submit a foreign subpoena to the district court for the county in which discovery is sought to be conducted in [Colorado]." § 13-90.5-103(1).  An application to the district court to enforce a subpoena issued under section 13-90.5-103 must comply with the rules or statutes of Colorado.  § 13-90.5-106, C.R.S. 2019.  More specifically, the procedural and evidentiary laws of Colorado govern this analysis.  *See* § 13-90.5-106 cmt. ("Evidentiary issues that may arise, such as objections based on grounds such as relevance or privilege, are best decided in the discovery state under the laws of the discovery state (including its conflict of laws principles).").

¶ 11    But, if Colorado law governs the process that must apply, what law governs the substantive legal issues that a court may have to decide?  Colorado has adopted the general rule, as set forth in the restatement (Second) of Conflicts of Law, that the law of the state with the most "significant relationship" with the occurrence and the parties governs.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007).  Once the state having the most significant relationship is identified, the law of that state is then

applied to resolve the issue. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444, 447-48, 601 P.2d 1369, 1372 (1979). "[T]he courts of a state, in cases where the laws of another state are involved, may and should take notice of the decisions of the highest courts in the latter jurisdiction upon the law so involved." *Sullivan v. German Nat'l Bank,* 18 Colo. App. 99, 104, 70 P. 162, 164 (1902).

¶ 12    Because Regal was incorporated in Delaware, and the minority stockholders seek the enforcement of a subpoena for purposes of obtaining Mr. Anschutz's testimony in connection with the appraisal proceedings in a Delaware court, we conclude that we should apply Delaware law to resolve substantive legal matters. *See Great W. Producers Co-operative v. Great W. Unite Corp.,* 200 Colo. 180, 182 n.2, 613 P.2d 873, 875 n.2 (1980)(holding that the substantive law of Delaware applied because defendant corporation was incorporated under the laws of Delaware).

## C.    Relevance of Discovery

¶ 13    The Colorado Rules of Civil Procedure govern the scope of permissible discovery in civil cases. C.R.C.P. 26(b)(1) states that "parties may obtain discovery regarding any matter, not privileged,

that is relevant to the claim or defense of any party and proportional to the needs of the case . . . . Information within the scope of discovery need not be admissible in evidence to be discoverable."

¶ 14 The concept of relevance for discovery purposes is different than the concept of relevance of evidence at trial. *DA Mountain Rentals, LLC v. The Lodge at Lionshead Phase III Condo. Ass'n*, 2016 COA 141, ¶ 57. "[D]iscovery rules should be construed liberally to effectuate the full extent of their truth-seeking purpose" and "[i]n close cases, the balance must be struck in favor of allowing discovery." *Antero Res. Corp. v. Strudley*, 2015 CO 26, ¶ 32 (quoting *Direct Sales Tire Co. v. Dist. Court*, 686 P.2d 1316, 1321 (Colo. 1984)).

### D. Delaware Appraisal Proceedings

¶ 15 Under Delaware law, the statutory appraisal proceeding was created as a remedy for minority stockholders who view the sale price of a corporation as inadequate to seek "an independent judicial determination of the fair value of their shares." *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1, 19 (Del. 2017) (citation omitted). There is one issue in such an appraisal

trial: "the value of the dissenting stockholder's stock." *Id.* (citation omitted).

¶ 16    The Delaware Court of Chancery's task is to "determine the fair value of the shares." Del. Code Ann. tit. 8, § 262(h) (West 2019). To do so, the court "shall take into account all relevant factors." *Id.* The examination requires consideration of "all factors and elements which reasonably might enter into the fixing of value." *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

### 1.    Factors in Determining Fair Value

¶ 17    Factors which a Delaware court must consider in determining fair value include market value, asset value, dividends, earning prospects, the nature of the enterprise, and any other facts that were known or that could be ascertained as of the date of merger and that throw any light on the future prospects of the merged corporation. Id. (holding that these factors are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest but must be considered by the agency fixing the value). Additionally, "the deal price as a market indicator of fair value in appraisal cases conforms to [the Delaware court's] use of market-tested prices." Verition Partners Master Fund Ltd. v. Aruba

Networks, Inc., 210 A.3d 128, 135 n.41 (Del. 2019); see also Dell, 177 A.3d at 19 (holding that relevant factors in determining fair value include the deal price).

¶ 18    The court may not adopt an "either-or" approach at the outset, thereby relying exclusively on selected factors or accepting uncritically the valuation of one party.  See In re Appraisal of Metromedia Int'l Grp., Inc., 971 A.2d 893, 899-900 (Del. Ch. 2009), reargument granted, 2009 WL 1299116 (Del. Ch. 2009).  It is the court's duty to determine the core issue of fair value on the appraisal date.  Id.; see also Gonsalves v. Straight Arrow Publishers, Inc., 701 A.2d 357, 361 (Del. 1997)(noting the court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action").  After an analysis of all relevant factors, the court may then determine "that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate."  DFC Glob. Corp. v. Muirfield Value Partners, L.P., 172 A.3d 346, 388 (Del. 2017).

## 2.   Reliability and Weight of the "Deal Price"

¶ 19    As the minority stockholders correctly note, Delaware courts must consider all relevant factors, including the deal price, to decide whether a corporate sale was for fair value. *See Aruba Networks*, 210 A.3d at 135 n.41; *Dell*, 177 A.3d at 19. After an analysis of all relevant factors, the court may then determine the reliability of, and weight to attribute to, each factor, including the reliability and weight to be given to the deal price. *See DFC Glob.*, 172 A.3d at 388.

¶ 20    In recent appraisal decisions that have examined the reliability of a sale process, the Delaware Supreme Court has cited certain "objective indicia" suggesting that "the deal price was a fair price." *Dell*, 177 A.3d at 28; *accord DFC Glob.*, 172 A.3d at 376. But the presence of objective indicia does not establish a presumption in favor of the deal price, and the Delaware Supreme Court has rejected requests for the adoption of a presumption that the deal price reflects fair value if certain preconditions are met. *Dell*, 177 A.3d at 21. Rather, the indicia are merely a starting point for the analysis of whether the deal price was fair. But "[t]he fact that a transaction price was forged in the crucible of objective market

reality . . . is viewed as strong evidence that the price is fair." *Van de Walle v. Unimation, Inc.*, No. Civ. A. 7046, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991)(unpublished opinion).

¶ 21    When deciding what weight to give a deal price and whether it was reliable, *see DFC Glob.*, 172 A.3d at 388, Delaware courts have considered

- whether a merger was an arm's-length transaction with a third party, *see id.* at 349 (citing the fact that "the company was purchased by a third party in an arm's length sale" as a factor supporting fairness of the deal price);

- the absence of explicit or implicit collusion, whether among bidders or between the seller and a particular bidder, *see M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999)("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value.");

- the possibility that management will favor a particular bidder for self-interested reasons, which is a common risk in corporate sale processes, *see Huff Fund Inv. P'ship v. CKx, Inc.*, No. CV 6844-VCG, 2013 WL 5878807, at *13

(Del. Ch. Nov. 1, 2013)(unpublished opinion)(giving exclusive weight to a sales process where "[t]he record and the trial testimony support a conclusion that the process by which [the company] was marketed to potential buyers was thorough, effective, and free from any spectre of self-interest or disloyalty"), *aff'd*, No. 348,2014, 2015 WL 631586 (Del. 2015)(unpublished table decision);

- whether the transaction involves a controlling stockholder, *see Dell*, 177 A.3d at 25, 30 (holding that a "market is more likely efficient . . . if it has many stockholders [and] no controlling stockholder" and that "this was not a buyout led by a controlling stockholder" as a factor supporting fairness of the deal price);

- the existence of meaningful competition among multiple bidders during the pre-signing phase, *see Aruba Networks*, 210 A.3d at 136 (holding that where there was an open chance for buyers to bid, the level of competition was enough to support the reliability of the deal price); and

- whether there were improper motives behind the negotiation of the transaction, *see Cinerama, Inc. v. Technicolor, Inc.*,

663 A.2d 1156, 1172 (Del. 1995)(affirming the lower court's finding that the evidence did not support an "improper motive" on the part of the board in negotiating a good transaction for the stockholders); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 577 (Del. Ch. 2010)(crediting the record that showed the board "had no conflict of interest that gave them a motive to do other than the right thing" in their approach to value maximization).

¶ 22    In considering these factors in the determination of the reliability of the deal price, it is worth noting that Delaware law presumes that investors act to maximize the value of their own investments. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1380-81 (Del. 1995). "When a large stockholder supports a sales process and receives the same per-share consideration as every other stockholder, that is ordinarily evidence of fairness, not of the opposite . . . ." *Iroquois Master Fund Ltd. v. Answers Corp.*, 105 A.3d 989, 2014 WL 7010777, at *1 n.1 (Del. 2014) (unpublished table decision).

¶ 23    However, Delaware law also recognizes that, in some scenarios, circumstances may cause the interests of investors who

hold common stock to diverge. For example, desire for liquidity has been recognized as a benefit that "may lead directors to breach their fiduciary duties" and stockholder directors may be found to have breached their duty of loyalty if a "desire to gain liquidity . . . caused them to manipulate the sales process" and subordinate the best interests of the corporation and the stockholders as a whole. *In re Answers Corp. S'holder Litig.*, No. Civ. A. 6170-VCN, 2012 WL 1253072, at *7 (Del. Ch. 2012)(unpublished opinion)(quoting *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, No. Civ. A. 5334-VCN, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011)(denying a motion to dismiss where the plaintiff alleged that the director, who was also a large stockholder, sacrificed value in a sale because he needed liquidity to satisfy personal debts and fund a new venture)). Additionally, "certain institutional investors may be happy to take a sizeable merger-generated gain on a stock for quarterly reporting purposes, or to offset other losses, even if that gain is not representative of what the company should have yielded in a genuinely competitive sales process." *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 509 (Del. Ch.), *aff'd*, 11 A.3d 214 (Del. 2010).

## E.     Analysis

¶ 24     C.R.C.P. 26(b)(1) states that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party and proportional to the needs of the case . . . . Information within the scope of discovery need not be admissible in evidence to be discoverable."

¶ 25     The scope of our evaluation is limited to whether the evidence sought by the minority stockholders is relevant to their claim, and would allow the Delaware court to evaluate the reliability of the deal price.  *See* C.R.C.P 26(b)(1).  Given Colorado's liberal stance on discovery, and that Mr. Anschutz's motive, intent, and personal considerations for divesting his Regal shares would allow a Delaware court to evaluate the reliability of, and weight to attribute to, the deal price, we hold, for the following reasons, that Mr. Anschutz's testimony is relevant and discoverable.  *See id.*

¶ 26     The minority stockholders allege that the deal price in this case is an unreliable indicator of fair value and that the Delaware court should not give it weight in the appraisal case.  They state this is so because Mr. Anschutz may have accepted "less than fair value in order to accomplish other objectives."  They contend that, if

evidence showed that he was willing to take less money for his Regal shares "so that he could obtain a sale transaction that would accomplish personal liquidity, tax, estate planning or other objectives," then a Delaware court might conclude that the deal price is not a reliable indicator of fair value.

¶ 27    As noted above, when evaluating the reliability of the deal price, Delaware courts have considered whether the merger was an arm's-length transaction, whether there was collusion, whether the transaction involved a controlling stockholder, and whether there was improper motive in the negotiation of the transaction.  See DFC Glob., 172 A.3d at 349; Dell, 177 A.3d at 25, 30; M.P.M. Enters., 731 A.2d at 797; Cinerama, 663 A.2d at 1172.  Mr. Anschutz's testimony could shed light on whether he had any improper motive in negotiating a fair transaction on the minority stockholders' behalf, whether he had a conflict of interest in his approach to value maximization on their behalf, or whether the merger was an arm's-length transaction.  See Cinerama, 663 A.2d at 1172 (holding that the evidence did not support an "improper motive" in the negotiation of a good transaction for the stockholders); Dollar Thrifty, 14 A.3d at 577 (holding that the evidence showed that the

15

board did not have a conflict of interest that gave them a motive to avoid achieving value maximization for the stockholders). The testimony that the minority stockholders seek could persuade a Delaware court to give less weight to the deal price and more weight to other factors in the determination of the fair value of the Regal shares. In other words, the minority stockholders have demonstrated that Mr. Anschutz has knowledge of facts that are relevant to the resolution of this case.

### III. Apex Doctrine

¶ 28 Mr. Anschutz contends that, even if his testimony is relevant to the appraisal proceedings, we should affirm the trial court's order because the minority stockholders' "subpoena violated the apex doctrine." At its most general, the apex doctrine shields high-level corporate officers from depositions. *Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 6 (D.D.C. 2018). The doctrine is rooted in Fed. R. Civ. P. 26(c)(1), which provides that a court may, upon motion of a party or person from whom discovery is sought and "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." We disagree with Mr. Anschutz's contention.

16

## A.    Standard of Review, Preservation, and General Legal Principles

¶ 29    Although the trial court did not rule on the applicability of the apex doctrine, the issue was properly preserved for appellate review because Mr. Anschutz raised its applicability in pleadings that he had filed.  The court therefore had an opportunity to rule on it. *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 2016 COA 178, ¶ 11 ("All that is needed to preserve an issue for appeal is for the issue to be brought to the district court's attention so that the court has an opportunity to rule on it.").

¶ 30    When interpreting the Colorado Rules, we rely on various interpretive aids, including the Federal Rules and federal precedent interpreting Federal Rules.  *Garcia v. Schneider Energy Servs., Inc.*, 2012 CO 62, ¶ 7; *see also Garrigan v. Bowen*, 243 P.3d 231, 235 (Colo. 2010)("Because the Colorado Rules of Civil Procedure are patterned on the federal rules, we may also look to the federal rules and decisions for guidance.").

¶ 31    Colorado has an analogous rule to Fed. R. Civ. P. 26(c)(1). Like the federal rule, the Colorado rule permits a trial court to issue a protective order upon a showing of good cause.  *See* C.R.C.P. 26(c)("[F]or good cause shown, the court may make any order which

17

justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."). But the parties have not cited, and we have not found, any published Colorado appellate case that has generally applied the apex doctrine, or, more specifically, decided whether a trial court may anchor a finding of good cause to issue a protective order primarily on an individual's status as a "high ranking and important executive." So we must now decide whether we should apply special discovery rules unique to high-ranking executives to this case. For the reasons we discuss below, we conclude that we should not do so. Rather, we determine that the existing discovery rules, including the protective order provisions of C.R.C.P. 26(c), provide Mr. Anschutz with sufficient protection from any inappropriate or improper discovery requests.

## B. Application of the Apex Doctrine

¶ 32    Some federal courts developed the apex doctrine because they decided that "depositions of high-level officers severely burdens those officers and the entities they represent, and that adversaries might use this severe burden to their unfair advantage." *United States ex rel. Galmines v. Novartis Pharm. Corp.*, No. Civ. 06-3213,

18

2015 WL 4973626, at *1 (E.D. Pa. Aug. 20, 2015); *see also EchoStar Satellite, LLC v. Splash Media Partners, L.P.*, No. 07-cv-02611-PAB-BNB, 2009 WL 1328226, at *2 (D. Colo. May 11, 2009)("[H]igh ranking and important executives 'can be easily subjected to unwarranted harassment and abuse' and 'have a right to be protected, and the courts have a duty to recognize [their] vulnerability.")(citation omitted).

¶ 33     The doctrine provides that, before a party may depose a high-level corporate executive, such party must show that (1) the deponent has unique, first-hand, nonrepetitive knowledge of the facts at issue in the case; and (2) other, less burdensome avenues for obtaining the information sought have been exhausted. *In re Google Litig.*, No. C 08-03172 RMW PSG, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011); *Liberty Mut. Ins. Co. v. Superior Court*, 13 Cal. Rptr. 2d 363, 365 (Cal. Ct. App. 1992); *Alberto v. Toyota Motor Corp.*, 796 N.W.2d 490, 495 (Mich. Ct. App. 2010).

¶ 34     An essential component of the doctrine is that the burden of proof is shifted to the party seeking the corporate executive's deposition. *See, e.g., Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 310 F.R.D. 523, 527 (S.D. Fla. 2015)("The party seeking the

19

deposition of the high-ranking official has the burden to show that the deposition is necessary."); *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 699 (D.N.M. 2019)(quashing subpoenas where the plaintiffs did not show that the executive possessed "'unique personal knowledge' of facts relevant to any material issue"). "The 'apex' doctrine exists in tension with the otherwise broad allowance for discovery of party witnesses under the federal rules." *Apple Inc. v. Samsung Elec. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012).

¶ 35    But the apex doctrine does not rule the roost in all federal courts. Some of them have rejected the doctrine altogether, while others have tried to harmonize the doctrine's principles with Fed. R. Civ. P. 26. *See, e.g., Novartis Pharm.*, 2015 WL 4973626, at *2 (holding that "[t]he apex doctrine does not represent an exception to the rule that a party seeking to quash a subpoena bears the 'heavy burden' of demonstrating that the subpoena represents an undue burden," but, rather, the doctrine should be used as a tool for guiding the court's analysis in determining whether to limit discovery); *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015)(stating that, even in apex doctrine scenarios, the

plaintiff bears no burden to show that the deponent has special knowledge); *Van Den Eng v. Coleman Co.*, No. 05-MC-109-WEB-DWB, 2005 WL 3776352, at *2 (D. Kan. Oct. 21, 2005)(holding that high-level executives "are treated under the same standards as any other protective order, while taking into consideration special factors that may apply to such officials").

¶ 36    And, in federal courts that have adopted some version of the doctrine, the courts are split on which party bears the ultimate burden of persuasion when a high-level executive invokes the apex doctrine. *Tierra Blanca*, 329 F.R.D. at 697. As a result, a hybrid, burden-shifting version of the doctrine has developed, requiring an initial showing of unique personal knowledge by the party seeking discovery, but then placing "the ultimate burden of persuasion" on the executive to demonstrate that he or she in fact has no unique personal knowledge. *Naylor Farms, Inc. v. Anadarko OGC Co.*, No. 11-CV-01528-REB-KLM, 2011 WL 2535067, at *2 (D. Colo. June 27, 2011)(citing *EchoStar*, 2009 WL 1328226, at *2).

¶ 37    Our decision is informed by a trend. As we have just observed, federal courts do not uniformly follow the apex doctrine. And a growing number of state courts, including those whose rules

21

of civil procedure, like ours, are modeled on the federal rules, have rejected it. *See Netscout Sys., Inc. v. Gartner, Inc.*, No. (FS1) TCV146022988S, 2016 WL 5339454, at *6 (Conn. Super. Ct. Aug. 22, 2016)(unpublished opinion)(holding that the apex doctrine was incompatible with Connecticut law to the extent that it shifted the burden of showing good cause); *Citigroup Inc. v. Holtsberg*, 915 So. 2d 1265, 1269 (Fla. Dist. Ct. App. 2005)(declining to apply the apex doctrine where Florida's discovery rules did not contain a requirement that the party seeking deposition must first show that the high-level executive has unique or superior knowledge); *State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 607 (Mo. 2002)(declining to adopt the apex doctrine and holding that the deposition of high-level executives should proceed in accordance with the Missouri rules governing discovery); *Thomson v. Zillow, Inc.*, 32 N.Y.S.3d 455, 459 (N.Y. Sup. Ct. 2016)(declining to extend discovery rules for executives where respondents had shown that they seek information which was material and necessary to their defense); *Bradshaw v. Maiden*, No. 14 CVS 14445, 2017 WL 1238823, at *5 (N.C. Super. Ct. Mar. 31, 2017)(unpublished opinion)(declining to apply the apex doctrine, and restricting the

deposition of an executive under the North Carolina Rules of Civil Procedure); *Crest Infiniti, II, LP v. Swinton*, 174 P.3d 996, 1004 (Okla. 2007)(declining to adopt the apex doctrine where it shifted the burden to the party seeking discovery, because, in Oklahoma, "the burden of showing 'good cause' is statutorily placed on the party objecting to discovery"). This trend signals to us that the apex doctrine's influence has reached its zenith and has begun to decline.

¶ 38    In addition to the doctrine's waning influence, which undercuts Mr. Anschutz's request to apply it to this case, we conclude that it is inconsistent with Colorado law.

¶ 39    As we explained, the doctrine presumes that "apex" executives should not be deposed unless the party requesting the deposition can establish reasons why the doctrine should not bar the deposition. But, much like the cases in our sister states that we cited above, Colorado law flips the script because it presumes that such executives should be deposed unless they can show good cause why the deposition should not be held. *See* C.R.C.P. 26(c).

¶ 40    The scope of discovery is broad under the Colorado Rules of Civil Procedure. *Williams v. Dist. Court*, 866 P.2d 908, 911 (Colo.

1993). "[A]ll relevant, non-privileged information should be discoverable unless it would cause annoyance, embarrassment, oppression, or undue burden or expense." *Hadley v. Moffat Cty. Sch. Dist. RE-1*, 681 P.2d 938, 945 (Colo. 1984). "Discovery rules should be accorded a broad and liberal interpretation in order to effect their purpose of adequately informing the litigants of the facts giving rise to a claim or defense." *Id.* And, as Justice White recognized in the plurality opinion in *Branzburg v. Hayes*, 408 U.S. 665, 690 n.29 (1972)(quoting 8 J. Wigmore, *Evidence* § 2192 (McNaughton rev. 1961)), "everyone is obligated to testify when properly summoned," and "derogations" to this "positive general rule" are "obstacle[s] to the administration of justice."

¶ 41     None of our civil discovery rules, including C.R.C.P. 26, refer to the apex doctrine. Mr. Anschutz's request that we apply it to this case is therefore, at its core, an invitation that we amend the Rules of Civil Procedure. And that we cannot do because the supreme court's power to adopt and to amend such rules is exclusive. *See* Colo. Const. art VI, § 21 ("The supreme court shall . . . make and promulgate rules governing practice and procedure in civil . . .

cases."); *Gold Star Sausage Co. v. Kempf*, 653 P.2d 397, 400 (Colo. 1982)(same).

¶ 42    But our conclusion does not leave Mr. Anschutz without a remedy.  Our supreme court has recognized that the "broad discovery permitted by C.R.C.P. 26(b)(1) may lead to discovery abuses," *Williams*, 866 P.2d at 912, including, conceivably, the sort of abuses that the apex doctrine is designed to prevent.  But there are ways to protect against such abuses.  "C.R.C.P. 26(c) allows the trial court to issue protective orders as justice requires 'to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense.'"  *Id.*  The party seeking protection from discovery bears the burden to establish good cause to obtain relief.  *See* C.R.C.P. 26(c); *Williams*, 866 P.2d at 912.

¶ 43    So, in this case, if Mr. Anschutz can establish such good cause, the trial court could issue a protective order.  In this regard, Mr. Anschutz could, for example, ask the trial court to consider "the possibility of harassment and the potential disruption of business" that his deposition might cause.  *Gen. Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002).

¶ 44     In reaching the conclusion that we will not apply the apex doctrine to this case, we note the following:

- The minority stockholders have alleged that Mr. Anschutz's testimony is relevant to the question of whether he was willing to take less money for his Regal shares "so that he could obtain a sale transaction that would accomplish personal liquidity, tax, estate planning or other objectives." Indeed, he may be the best possible witness to testify about his intent.

- Mr. Anschutz does not deny that he had knowledge of the unique and relevant facts. *See Naylor Farms*, 2011 WL 2535067, at *4 (holding that a declaration sworn under penalty of perjury where executive unequivocally disavows any unique personal knowledge is competent evidence that may be considered by the court); *EchoStar*, 2009 WL 1328226, at *3 (holding that executive had satisfied his burden and was entitled to a protective order precluding his deposition where he provided an affidavit establishing that he had "no personal knowledge of the circumstances surrounding" the agreement in dispute).

¶ 45    We therefore reverse the trial court order denying the minority stockholders' motion to compel Mr. Anschutz to testify at a deposition.  We remand the case to the trial court to grant the minority stockholders' motion to compel him to testify at a deposition unless, after an evidentiary hearing, the court determines that it should issue a protective order under C.R.C.P. 26(c).

JUSTICE MARTINEZ and JUDGE DAVIDSON concur.