24CA2196 Marriage of Palominos Correa 03-05-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA2196
Arapahoe County District Court No. 23DR30495
Honorable Michelle Jones, Judge

In re the Marriage of

Daniel Palominos Correa,

Appellee,

and

Carolina Aranis Jimenez,

Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE LUM
Tow and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

Daniel Palominos Correa, Pro Se

Ian Griffin, Aurora, Colorado, for Appellant

¶ 1      In this dissolution of marriage case between Carolina Aranis Jimenez (wife) and Daniel Palominos Correa (husband), wife appeals the portions of the permanent orders concerning the property division.  We affirm in part and reverse in part the district court's permanent orders and remand the case for further proceedings.

## I.      Background

¶ 2      The parties married in 2013 in Santiago, Chile.  Notably, the parties' Chilean marriage certificate stated that they "agreed to a total separation of assets" marriage.  At the permanent orders hearing, two witnesses with expertise in Chilean matrimonial law[1] testified that this meant the parties "elect[ed] to have their property treated separately" and that a Chilean court would award the property to the party in whose name the property was titled.

¶ 3      After they married, the parties lived in Chile for several years.  During that time, they purchased six apartments in Chile, all of which were titled in wife's name only (the disputed Chilean apartments).  The parties then moved to Colorado at some point

---

[1] One of the expert witnesses represented wife in the Chilean divorce proceedings; the other was related to wife.  The court accepted the witnesses as experts over husband's objection. Husband doesn't appeal the court's decision.

between 2018 and 2020. Thereafter, they purchased a home and a timeshare, both of which were jointly titled.

¶ 4     In April 2023, husband filed a petition for dissolution of marriage. The district court held a permanent orders hearing in September 2024. At the hearing, wife argued that the parties' Chilean marriage certificate constituted a valid agreement to keep any asset titled in one party's name separate, even if the asset was purchased during the parties' marriage. Thus, she argued that all six disputed Chilean apartments were her separate property and should not be included in the court's division of the marital estate. In contrast, husband argued that the Chilean marriage certificate was not a valid agreement and that the disputed Chilean apartments were marital property because they were purchased during the parties' marriage.

¶ 5     At the end of the hearing, the court dissolved the parties' marriage. The court later entered permanent orders. It found, as relevant here, that the disputed Chilean apartments were marital property. It also excluded a 2013 Mercedes from the marital estate, finding that husband had sold the vehicle to a relative. The court then valued the parties' property and distributed it, awarding wife

$469,739, or roughly 51%, of the marital estate, which included one vehicle and all six disputed Chilean apartments. The court awarded husband $442,780, or roughly 49% of the marital estate, which included one vehicle, the parties' marital home, and their timeshare.

¶ 6      On appeal, wife contends that the district court made several errors in dividing the parties' marital property. Specifically, she argues that the court erred by (1) finding that the disputed Chilean apartments were marital; (2) excluding the 2013 Mercedes from the marital estate; and (3) miscalculating the value of several of the parties' assets.

     II.     Property Division Framework and Standard of Review

¶ 7      A district court has great latitude in equitably dividing a marital estate in such proportions as it deems just. *See* § 14-10-113(1), C.R.S. 2025; *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 28. Before dividing a marital estate, a court must determine whether an asset is marital and subject to division, or whether it is separate and not subject to division. § 14-10-113(1); *see Medeiros*, ¶ 49; *In re Marriage of Cardona*, 2014 CO 3, ¶ 12. Then, it must value the property as of the date of the decree or the date of the

hearing on disposition of property if such hearing precedes the date of the decree. § 14-10-113(5); *Cardona*, ¶ 12.

¶ 8    In equitably distributing the marital property, the district court must consider all relevant factors, including the contributions of each spouse; the value of the property set apart to each spouse; the economic circumstances of each spouse; and any increase, decrease, or depletion in the value of any separate property during the marriage. § 14-10-113(1)(a)-(d); *In re Marriage of Balanson*, 25 P.3d 28, 35 (Colo. 2001). The overall property division must be equitable, but it does not have to be equal. *In re Marriage of Wright*, 2020 COA 11, ¶ 3. "The key to an equitable distribution is fairness," which depends on the facts and circumstances of each case. *Id.* (quoting *In re Marriage of Gallo*, 752 P.2d 47, 55 (Colo. 1988)).

¶ 9    Determining how to weigh the relevant factors and equitably divide the marital estate is within the district court's sound discretion, and we won't disturb a court's property division orders absent a showing that it abused that discretion. *In re Marriage of Smith*, 2024 COA 95, ¶¶ 64, 67. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or

4

based on a misapplication of the law. *Id.* at ¶ 65. We review the court's application of the law de novo. *C & C Invs., LP v. Hummel*, 2022 COA 42, ¶ 29; *see Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008).

### III. Determination that the Chilean Apartments Were Marital Property

¶ 10 Wife first contends that the district court erred by determining that the disputed Chilean apartments were marital property rather than her separate property. To get there, she argues that the court erred by failing to apply Chilean law to determine whether the parties' Chilean marriage certificate constituted a "valid agreement" under section 14-10-113(2)(d). She asserts that under Colorado's choice-of-law approach, the court should have applied Chilean law to determine whether the agreement was "valid." And she points out that at the permanent orders hearing, two expert witnesses testified that under Chilean law, the parties' marriage certificate would be treated as a valid agreement to keep their individually titled property separate.

¶ 11 We agree that the district court erred by failing to conduct a choice-of-law analysis before determining whether the parties'

marriage certificate was a "valid agreement" under section 14-10-113(2)(d). But, as explained below, we don't have enough information to determine whether the court erred by ultimately applying Colorado's substantive law to evaluate the validity of the agreement.

### A. The "Valid Agreement" Exception

¶ 12 Generally, all property acquired by either spouse during the marriage is presumed to be marital property. § 14-10-113(2); *In re Marriage of Blaine*, 2021 CO 13, ¶ 17. However, a spouse can overcome the marital property presumption by establishing that one of the exceptions under section 14-10-113(2) applies. *Blaine*, ¶ 17. As relevant here, property is not marital if the parties entered into a "valid agreement" to exclude that property from the marital estate. § 14-10-113(2)(d); *In re Marriage of Bartolo*, 971 P.2d 699, 700 (Colo. App. 1998).

¶ 13 The term "valid" is not defined in section 14-10-113, nor is it defined anywhere else in the Uniform Dissolution of Marriage Act, §§ 14-10-101 to -133, C.R.S. 2025. *In re Marriage of Zander*, 2021 CO 12, ¶ 17. The supreme court has construed the term "valid" to mean "something that is effective and enforceable under the law"

6

that was in effect at the time the parties entered into the agreement. *Id.* at ¶¶ 11 n.5, 17. This brings us to the primary question in this case: When parties enter into an agreement in another state or country that one party asserts excludes property from their marital estate, should a Colorado district court apply Colorado law or the law of the other state or country to determine whether the agreement is "valid" for purposes of 14-10-113(2)(d)?

### B. Choice of Law for Determining the Validity of Agreements Executed Outside of Colorado

¶ 14    The parties' marriage certificate is dated 2013. The then-operative Colorado Marital Agreement Act (CMAA), §§ 14-2-301 to -310, C.R.S. 2013, provides no guidance regarding whether to apply Colorado's or Chile's law to determine the agreement's validity. But Colorado's general conflict-of-laws approach does.

¶ 15    Under this approach, which is consistent with the Restatement (Second) of Conflict of Laws (Restatement), Colorado courts must "apply the law chosen by the parties [within their agreement] unless there is no reasonable basis for their choice or unless applying the chosen [jurisdiction's] law would be contrary to the fundamental policy of [Colorado]." *Target Corp. v. Prestige*

7

*Maint. USA, Ltd.*, 2013 COA 12, ¶ 14; *see* Restatement (Second) of Conflict of L. § 187 (A.L.I. 1971).

¶ 16     When parties have not expressly chosen the law to govern their agreement, Colorado courts must apply the law of the jurisdiction that has the most significant relationship to the agreement. *Mountain States Adjustment v. Cooke*, 2016 COA 80, ¶ 19. To determine what jurisdiction has the most significant relationship, a court must consider five factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*; Restatement (Second) of Conflict of L. § 188. And it must do so within the context of section 6 of the Restatement, which lists general factors relevant to the choice-of-law inquiry. *See ITT Specialty Risk Servs. v. Avis Rent A Car Sys., Inc.*, 985 P.2d 43, 47 (Colo. App. 1998); *see also Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979) ("In analyzing which [jurisdiction] has the most significant relationship, the principles set forth in Restatement (Second) sections 6 and 188 are to be taken into account."

(footnotes omitted)).  Thus, a court must also evaluate (1) the needs of the interstate and international systems; (2) the relevant policies of the forum state; (3) the relevant policies of other interested jurisdictions and the relative interests of those jurisdictions in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of result; and (7) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of L. § 6.

¶ 17     After a court has determined what jurisdiction has the most significant relationship to an agreement, it must then apply that jurisdiction's substantive law to resolve any substantive legal disputes.  *See BlueMountain Credit Alts. Master Fund L.P. v. Regal Ent. Grp.*, 2020 COA 67, ¶¶ 11-12.

¶ 18     We discern no reason to depart from this approach when determining the choice of law in a dispute over the validity of a marital agreement because such agreements are construed and treated in the same manner as other contracts.  *See In re Estate of Gadash*, 2017 COA 54, ¶ 40.  Indeed, the Uniform Premarital and Marital Agreements Act (UPMAA), which replaced the CMAA in

2014, *see* Ch. 239, sec. 1, §§ 14-2-301 to -313, 2013 Colo. Sess. Laws 1159-64, specifically directs courts to apply Colorado's choice of law approach when faced with an out-of-state agreement that is silent about the governing law. *See* § 14-2-304(1)(b), C.R.S. 2025 (where the marital agreement doesn't effectively designate the governing law, the court should determine validity by applying "the law of this state, including the choice-of-law rules of this state").

¶ 19　　Thus, to determine the validity and enforceability of an out-of-state marital agreement when the agreement doesn't contain a choice-of-law provision, the court must first determine which jurisdiction has the most significant relationship and apply that jurisdiction's law.[2]

---

[2] Our conclusion doesn't conflict with the supreme court's analysis of the "valid agreement" exception in *In re Marriage of Zander*, 2021 CO 12, or *In re Marriage of Blaine*, 2021 CO 13. In both cases, the supreme court held that for an agreement to be "valid" under section 14-10-113(2)(d), C.R.S. 2025, it must meet the requirements of the Colorado statutes governing premarital or marital agreements that were in effect at the time the parties entered into the agreement — either the CMAA or the UPMAA. *See Zander*, ¶¶ 18-20; *Blaine*, ¶¶ 18-20. However, the choice-of-law question was not raised in either case. Thus, we assume that Colorado law applied when evaluating the validity of those agreements. And when Colorado law applies, the validity of an agreement to exclude property from a marital estate is controlled by the Colorado law that was in effect at the time the parties entered into the agreement.

## C. Application

¶ 20    In its permanent orders, the district court acknowledged wife's argument that the court should apply Chilean law to determine whether the parties' marriage certificate constituted a "valid agreement" under section 14-10-113(2)(d).  Nonetheless, the court didn't conduct a choice-of-law analysis before determining that the Chilean marriage certificate didn't constitute a "valid agreement" under section 14-10-113(2)(d).  Instead, the court found that the marriage certificate didn't "meet any requirements for a valid prenuptial type of agreement" because it wasn't signed, didn't indicate that the parties exchanged financial disclosures, and didn't contain "conspicuous language."  Thus, as best we can tell, it appears that the court looked to Colorado's current statutory framework — the UPMAA — to determine whether the parties' alleged agreement was "valid."  *See* § 14-2-306, C.R.S. 2025 (all premarital or marital agreements must be in a record and signed by both parties); § 14-2-309(1)(d), C.R.S. 2025 (a premarital or marital agreement is not enforceable if one of the parties did not receive adequate financial disclosures before signing the agreement); § 14-2-309(3) (a premarital or marital agreement is not enforceable if it

11

does not contain a notice of waiver of rights, the language of which must be "conspicuously displayed").

¶ 21 We conclude that the district court erred by not conducting a choice-of-law analysis before determining whether the parties' Chilean marriage certificate constituted a "valid agreement" under section 14-10-113(2)(d). And although a court's ultimate choice-of-law determination is a question of law that we review de novo, *see Mountain States Adjustment,* ¶ 13, its analysis of the factors under sections 6 and 188 of the Restatement requires factfinding — a function we cannot engage in as an appellate court. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.,* 2019 CO 51, ¶ 18 (noting that trial courts make factual findings while appellate courts pronounce law); *see also People in Interest of J.L.,* 121 P.3d 315, 318 (Colo. App. 2005) ("[W]e cannot make factual findings of our own.").

¶ 22 Because the district court didn't conduct the choice-of-law analysis, it didn't make any factual findings related to sections 6 and 188 of the Restatement. Without those findings, we can't determine which jurisdiction's law — Colorado's or Chile's — the court should have applied to determine if the parties' marriage

certificate constituted a "valid agreement" for purposes of excluding property from the marital estate under section 14-10-113(2)(d). Consequently, we can't determine if the court erred by finding that the disputed Chilean apartments were marital property.

¶ 23    We acknowledge that the district court stated that it didn't matter if the disputed Chilean apartments were "marital or not" because its overall division of property would be the same either way. Specifically, the court found that even if the apartments were wife's separate property, its overall division of property would still be equitable because wife would have significantly more separate property at her disposal, which would be considered part of her economic circumstances. But without more specific findings about this alternative conclusion, we can't say that the error was harmless. *See Balanson*, 25 P.3d at 38 (When a trial court erred by classifying certain property as marital, the error wasn't harmless despite an alternative finding that the division would remain the same even if the property was separate; the court didn't make sufficient findings to explain how the separate property "as merely an economic circumstance would result in a division of marital

property that [was] identical to one in which such property [was] considered to be marital property.").

¶ 24 Accordingly, we reverse the portion of the permanent orders concerning property division, and we remand the case for the district court to conduct a choice-of-law analysis before determining whether the parties' marriage certificate constituted a "valid agreement" under section 14-10-113(2)(d).

## IV. Determination that the 2013 Mercedes Was Not Part of the Marital Estate

¶ 25 Wife also contends that the district court erroneously excluded a 2013 Mercedes from the marital estate. Although we have concluded that the court erred in determining whether the parties' property was marital or separate, that conclusion has no bearing on whether the court erred by excluding the 2013 Mercedes from the marital estate. Thus, we address this contention on the merits. We conclude that the court did not err because the record supports its findings about the vehicle and its conclusion that it wasn't part of the marital estate because neither party owned it at the time of dissolution.

¶ 26    "Only the marital property existing at the time of dissolution [i]s available for distribution." *In re Marriage of Lockwood*, 971 P.2d 264, 267 (Colo. App. 1998). And a spouse is free to dispose of property, including marital property, during a marriage without the other spouse's permission. *See In re Marriage of Schmedeman*, 190 P.3d 788, 791 (Colo. App. 2008). Thus, absent a finding that a spouse dissipated the property in anticipation of the dissolution or engaged in other conduct constituting economic fault, the property may not be included in the marital estate. *See id.*; *Lockwood*, 971 P.2d at 267.

¶ 27    Here, the district court found that the 2013 Mercedes was not a marital asset because "credible evidence [showed] that [the] vehicle was sold to a relative." Indeed, husband testified that, in 2021, he sold the 2013 Mercedes to his sister. He testified that his sister paid him a total of $10,000 for the vehicle and that he deposited those funds in the parties' joint bank account. Additionally, he clarified that he still insured the 2013 Mercedes for his sister but that she paid him for her portion of the insurance every month.

¶ 28     We acknowledge, as wife points out, that husband admitted that he had never transferred the title of the 2013 Mercedes to his sister. But the district court heard that testimony and still found that husband had sold the vehicle to his sister without any finding that he improperly did so to dissipate his assets in anticipation of the dissolution. And we cannot reweigh the evidence. *See In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007) ("It is the responsibility of the trial court as the trier of fact to determine the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence."); *see also In re Marriage of Evans*, 2021 COA 141, ¶ 45 ("We are not at liberty to re-evaluate the conflicting evidence and set aside findings supported by the record.").

¶ 29     Accordingly, we conclude that the district court did not err by finding that husband had sold the 2013 Mercedes to a third party and, thus, excluding it from the marital estate.

## V.     Valuation of the Parties' Assets

¶ 30     Wife contends that the district court erroneously valued the disputed Chilean apartments, two other Chilean apartments that were wife's separate property, the parties' marital home, the vehicles, and the timeshare.

¶ 31    A court must value the parties' property to equitably divide the

marital estate.  *See Wright*, ¶ 4 (The court is "required to find the

approximate current value of all property owned by the parties.").

The court may base its values on an expert's testimony, the parties'

testimony, documentary evidence, its own calculations, or a

combination thereof.  *See In re Marriage of Nevarez*, 170 P.3d 808,

812 (Colo. App. 2007); *see also Medeiros*, ¶ 41 ("[T]he court may

select the valuation of one party over that of the other party or

make its own valuation . . . .").

¶ 32    However, it is the parties' duty to present the district court

with the data needed to allow it to value the property.  *In re

Marriage of Rodrick*, 176 P.3d 806, 815 (Colo. App. 2007).  And "any

failure by the parties in that regard does not provide them with

grounds for review."  *Id.*

A. Chilean Properties

¶ 33    Wife contends that the district court erred in its valuation of

eight Chilean properties: the six disputed Chilean apartments and

wife's two separate, premarital apartments.[3]  If the district court

---

[3] Husband doesn't appeal the district court's classification of wife's
premarital apartments as her separate property.

determines that the disputed Chilean apartments are marital after conducting a choice-of-law analysis on remand, it will need to value those properties as of the date of the permanent orders hearing. Accordingly, we will address wife's challenges with respect to those properties. But regardless of the district court's ultimate classification of the disputed apartments as marital or separate, it will need to reconsider its division of marital property in light of the parties' economic circumstances at the time of the remand proceedings. *In re Marriage of Krejci*, 2013 COA 6, ¶¶ 17-18. For this reason, we need not address wife's arguments relating to the valuation of her two premarital properties.

¶ 34    The district court adopted husband's estimated values of all six disputed Chilean apartments. In doing so, the court found the following:

- Each of the four "Carmen" apartments that were purchased during the marriage was worth $106,881; two had an outstanding mortgage balance of $11,152, and two had an outstanding mortgage balance of $25,000.

- Each of the two "San Francisco" apartments that were purchased during the marriage was worth $110,332,

and both had outstanding mortgage balances of $21,282.[4]

The record supports these findings.

¶ 35 At the permanent orders hearing, husband testified about the value of each disputed Chilean apartment. But wife objected, arguing that husband's testimony was inadmissible because he did not own any of the properties or have the requisite personal knowledge to value them.[5] On appeal, citing *In re Marriage of Plummer*, 709 P.2d 1388 (Colo. App. 1985), wife reiterates this contention. But we disagree with wife's interpretation of *Plummer* — we do not interpret it to hold that a lay witness may never testify to the value of property they don't own.

---

[4] As we understand it, the parties referred to the apartments as "Carmen" or "San Francisco" based on the streets on which they were located.

[5] Although wife objected to husband's testimony about the value of each Chilean property, she didn't object to his testimony about the estimated mortgage balance for each of the six apartments purchased during the marriage. Husband testified that he believed the mortgage balances he listed in the joint spreadsheet were accurate because they were based on statements he received from wife. Although unclear, it doesn't appear that wife challenges the court's findings about the mortgage balances on appeal. But even if she did, we would discern no error because those findings were supported by husband's testimony.

¶ 36    In *Plummer*, the husband claimed that he should be allowed to provide a lay opinion of the value of the wife's separate property because any increase in the value of that property was marital, and thus, he was considered an "owner" of that property. 709 P.2d at 1389. A division of this court disagreed with the husband's argument, noting that the husband's "interest" in the increase in value of the wife's properties was limited and didn't automatically qualify him to give an "owner's opinion" of the value of the underlying properties. *Id.* at 1390. Moreover, the *Plummer* court noted that the husband's personal knowledge of the properties was limited — his testimony about the property values was based on looking at "certain unnamed books" that contained information about property values, and he had never even entered at least one of the properties he sought to value. *Id.* at 1389-90. Thus, the *Plummer* division concluded that the husband's testimony was inadmissible because he did not have "the personal knowledge of the [separate] properties in question [or] an owner's continuing interest in the value of the properties." *Id.* at 1390.

¶ 37    Here, unlike *Plummer*, the record shows that husband had extensive personal knowledge about the disputed Chilean

properties. Specifically, the district court found, with record support, that husband's testimony about the values of the disputed Chilean properties was admissible because (1) those properties "were purchased with [husband's] assistance during the marriage," and (2) husband had personal knowledge of the properties because he had managed them for several years, which included signing leases, working with tenants, and making repairs to the properties. In other words, husband "had the means to form an intelligent opinion, derived from an adequate knowledge of the nature, kind, and value of the property in controversy." *Id.* at 1389 (citing *City & County of Denver v. Hinsey*, 493 P.2d 348, 350 (Colo. 1972)). Thus, even if husband was not qualified to give "an owner's opinion" of the values of the disputed Chilean properties, *Plummer*, 709 P.2d at 1390, the district court didn't abuse its discretion by allowing husband's testimony because he established a sufficient foundation for the testimony regardless of his status as an owner or nonowner. *See* CRE 701; *cf. Hinsey*, 493 P.2d at 350-51 (concluding that two nonowner witnesses couldn't provide lay opinions regarding the value of certain properties, but only because they didn't have the knowledge to do so, not because they were nonowners).

21

¶ 38    Moreover, we note that while wife repeatedly claimed that she was the sole owner of all the Chilean apartments, she didn't provide the court with any testimony about their values. In fact, the record shows that throughout the entire case, wife only provided estimated values for two of the disputed Chilean apartments in one of her financial affidavits. To the contrary, husband provided estimated values for all the disputed Chilean apartments, both through his testimony and by listing them in his financial affidavits.

¶ 39    Based on the foregoing, we conclude that the district court didn't abuse its discretion because (1) husband's valuation testimony was admissible based on his extensive knowledge of the disputed Chilean apartments; (2) it was within the district court's discretion to select husband's valuations over wife's in relation to the two disputed Chilean apartments that wife valued in her first financial affidavit;[6] and (3) the court valued the other disputed

---

[6] Notably, in wife's first financial affidavit, she valued one of the disputed Chilean apartments at $107,938. Thus, if anything, wife actually benefited from the district court's selection of husband's estimated value of that apartment — $106,881 — because it was lower than wife's. In other words, regardless of whether the disputed Chilean apartment was separate or marital property, wife received an asset that she claimed was worth more than what the court calculated.

Chilean apartments based on the only evidence available to it —
husband's testimony and financial affidavits. *See Medeiros*, ¶ 41
(the court may select one party's valuation over that of the other
party); *In re Marriage of Zappanti*, 80 P.3d 889, 892-93 (Colo. App.
2003) (a trial court must value the parties' property based on the
evidence available to it). Moreover, wife's failure to provide any
valuation evidence, at least in relation to four of the disputed
Chilean apartments, doesn't provide her with a basis to attack the
court's valuation of those properties. *See Krejci*, ¶ 23; *Zappanti*, 80
P.3d at 892-93.

¶ 40    Last, to the extent wife argues that the district court erred by
taking judicial notice of the Chilean exchange rate to value the
Chilean properties, the argument is unpreserved. At the hearing,
husband asked the court to take judicial notice of the exchange
rate, and wife stated she believed that the appropriate exchange
rate was the rate provided by the Central Bank of Chile. The court
then took judicial notice "of the exchange rate as listed by the
Central Bank of Chile as of today, September 25th, 2024, for any
exchange value rates that need to be determined by the [c]ourt in
this matter." Thereafter, wife did not object. Thus, we decline to

address any argument by wife on this issue. *See* CRE 103(a)(1); *see also Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 325 (Colo. 2009) ("In order to properly preserve an objection to evidence admitted at trial, a timely and specific objection must appear in the trial court record.").

¶ 41 Accordingly, we conclude that the district court did not abuse its discretion in valuing the disputed Chilean apartments.

## B. Other Marital Property Valuations

¶ 42 Our conclusion that the court erred by classifying the disputed Chilean apartments as separate property does not dispose of the issue of whether the court erred in its valuation of the parties' other marital property because such property must be valued as of the date of the decree or the date of the hearing on disposition of property if such hearing precedes the date of the decree. § 14-10-113(5). Accordingly, we consider wife's valuation arguments related to the marital home, the vehicles, and the timeshare.

## 1. Marital Home

¶ 43 The district court found that the value of the parties' marital home was $745,000 with an outstanding mortgage balance of

24

$442,035, making the equity in the home $302,965. The record supports this finding.

¶ 44    First, the parties stipulated that the outstanding mortgage balance was $442,035. Second, husband testified that he believed the home was worth $728,000. Wife then testified that she believed the home was worth more than husband's estimate because he did not account for the finished basement, extra bedroom, or yard improvements. And, although wife did not specifically testify to the home's value, she listed its value as $760,000 in the parties' joint spreadsheet.

¶ 45    We conclude that the court's valuation was reasonably based on husband's testimony about the estimated value of the home in conjunction with wife's testimony about the home's improvements. *See Krejci*, ¶ 23 (we will not disturb a district court's determination of the value of marital property on appeal "if it is reasonable in light of the evidence as a whole").

¶ 46    We reject wife's argument that the district court erroneously relied on husband's testimony about the estimated value of the home because it was "based solely" on an online estimate from Zillow, a real estate website. "The rationale underlying an owner

being allowed to testify as to the value of his own property without being qualified as an expert is that an owner has extensive knowledge of the property and a heightened awareness as to its value." *Plummer*, 709 P.2d at 1389-90. And here, as noted by the district court, husband's estimated value was based on his knowledge as an owner of the home who had lived there for several years.

¶ 47 True, an owner's lay opinion of the value of their property must be based on "proper considerations." *Id.* at 1389. But we see no reason why it was improper for husband, as an owner of the home, to consult Zillow or other similar real estate websites to help him formulate his opinion of the home's value. *Cf. Krajeski v. Krajeski*, 2025 UT App 19, ¶ 48 n.10 (noting that an owner may estimate the value of their property unless it appears that they have no realistic idea of its value and that an owner may consult Zillow to establish their estimated value). Rather, husband's reliance on Zillow as part of the basis for his lay opinion of the home's value goes to the opinion's weight, not its admissibility. *See Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*, 117 P.3d 60, 70 (Colo. App. 2004); *see also Olivera v. Rude-Olivera*, 411 P.3d 587, 592-93

(Alaska 2018) (stating that the adequacy of the foundation of an owner's opinion of the value of their property and the weight to be afforded to such an opinion are considerations for the fact finder).

¶ 48 Based on the foregoing, we conclude that the district court didn't abuse its discretion in valuing the marital home.

### 2. Vehicles

¶ 49 Wife next argues that the district court erred by adopting husband's proposed values of two vehicles: a 2019 Mercedes SUV (awarded to wife) and a 2019 Mercedes coupe (awarded to husband). She argues that her proposed valuations were based on the vehicles' fair market values while husband's valuations were not.

¶ 50 Both parties presented evidence of the vehicles' values. Thus, the district court had the discretion to select husband's valuation over wife's. *Medeiros*, ¶ 41. And we cannot reweigh the evidence on appeal. *See Evans*, ¶ 45; *see also In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence.").

### 3. Timeshare

¶ 51 Next, wife argues that the district court erred by adopting husband's proposed value of the Cancun timeshare instead of hers. Again, we disagree because both parties presented evidence of the timeshare's value, and it was within the court's discretion to choose husband's valuation over wife's. *See Medeiros*, ¶ 41.

### VI. Appellate Attorney Fees

¶ 52 Wife seeks an award of appellate attorney fees under C.A.R. 39.1, arguing that husband committed a "fraud upon the [district] court" in violation of C.R.C.P. 11 and section 13-17-102(2), C.R.S. 2025. Specifically, she asserts that husband "patently misled" the district court by "knowingly concoct[ing the] factually groundless argument" that the parties did not sign their Chilean marriage certificate. And she asserts that husband's alleged fraud "ought to entitle [her] to attorney fees and costs in this appeal." We disagree.

¶ 53 First, wife urges us to consider a document she filed with her opening brief — purportedly the signed Chilean marriage certificate — that does not appear in the certified appellate record and was not presented to the district court. But we cannot consider documents or information outside of the appellate record.

*See In re Marriage of McSoud*, 131 P.3d 1208, 1223 (Colo. App. 2006) ("Only facts appearing in the record can be reviewed . . . .").

¶ 54 Second, nothing in the record indicates that wife did not have the opportunity to present the allegedly signed Chilean marriage certificate to the district court.

¶ 55 Third, in light of the fact that wife had not proffered a signed version of the document to the district court, wife merely speculates that husband recalled — and his counsel knew — that the certificate was signed but intentionally misled the district court to believe it was not. She points to nothing in the record to support this serious allegation against husband and his counsel.

¶ 56 For these reasons, we deny wife's request for fees based on the alleged "fraud upon the court" in violation of C.R.C.P. 11 and section 13-17-102(2).

¶ 57 Wife also requests appellate attorney fees under section 14-10-119, C.R.S. 2025, arguing that she is unemployed and that there is a disparity between the parties' incomes. She points us to the parties' financial affidavits to support this argument. We direct the district court to address this request on remand because it is better equipped to determine the factual issues regarding the parties'

current financial circumstances. *See* C.A.R. 39.1; *In re Marriage of Schlundt*, 2021 COA 58, ¶ 54.

## VII. Remand Instructions

¶ 58    On remand, the court must conduct a choice-of-law analysis to decide what substantive law applies before determining whether the parties entered into a "valid agreement" to exclude property from the marital estate under section 14-10-113(2)(d). Based on that decision, the court must reconsider whether the disputed Chilean apartments are marital or separate.

¶ 59    If the court determines that the disputed Chilean apartments are marital, it should use the same property valuations for those apartments that it found in its permanent orders. *See In re Marriage of Capparelli*, 2024 COA 103M, ¶ 26. Regardless of whether the court determines that the disputed Chilean apartments are marital or separate, the court must reexamine the entire property division on remand based on the parties' current economic circumstances. *See id.*; *Krejci*, ¶¶ 17-18.

¶ 60    Moreover, if necessary, the district court may also reconsider the maintenance award based on the new property and debt allocations and the parties' economic circumstances at the time of

the remand proceedings. *See Capparelli*, ¶ 2; *see also Nevarez*, 170 P.3d at 815 (noting that property division and maintenance are inextricably intertwined).

¶ 61     Last, the court must consider on remand wife's request for appellate attorney fees under section 14-10-119.

## VIII.  Disposition

¶ 62     The judgment is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion.

JUDGE TOW and JUDGE MOULTRIE concur.